STATE OF WISCONSIN     MUNICIPAL COURT     BARRON COUNTY
                       CITY OF CHETEK

```
CITY OF CHETEK,              )
                             )      D E P O S I T I O N
           Plaintiff,        )
                             )
vs.                          )   Citation Nos.:   N851854
                             )                    H851855
KARL T. SWANSON,             )                    H851856
                             )
           Defendant.        )
```

The Deposition of JOE ATWOOD, taken under and pursuant to the provisions of Chapter 804 of the Wisconsin Statutes and the acts amendatory thereof and supplementary thereto, before Nancy A. Williams, Court Reporter and Notary Public in and for the State of Wisconsin, in the Municipal Courtroom of the City of Chetek, 101 Moore Street, Chetek, Wisconsin, on Wednesday, the 4th day of March, 2008, commencing at approximately 9:28 a.m.

ORIGINAL TRANSCRIPT FILED AT THE OFFICES OF:

LIDEN & DOBBERFUHL, S.C.

Reported By:        Nancy A. Williams
                    Court Reporter
                    320 West LaSalle Avenue, #4
                    Barron, Wisconsin.
                    (712) 537-5105

---

A P P E A R A N C E S

DWIGHT L. PRINGLE, ESQ., Attorney at Law, 3515 South Tamarac Drive, Suite 200, Denver, Colorado, 80237, appeared representing the Defendant.

L. JASON BRYAN, ESQ., Liden & Dobberfuhl, S.C., Attorneys at Law, 425 East LaSalle Avenue, Post Office Box 137, Barron, Wisconsin, 54812, appeared as cocounsel representing the Defendant.

MATTHEW J. CORNETTA, ESQ., Ruder-Ware, Attorneys at Law, 402 Graham Avenue, Post Office Box 187, Eau Claire, Wisconsin, 548702-0187, appeared as counsel representing the City of Chetek.

ALSO PRESENT:  Kathy Wietharn

I N D E X

WITNESS:                                      PAGE

Joe Atwood

     Examined by Mr. Pringle                  3, 94

     Examined by Mr. Cornetta                 93

OBJECTIONS BY MR. CORNETTA:  18, 54, 80, 82, 88

I N D E X   T O   E X H I B I T S

ATWOOD EXHIBITS                               Marked
     Atwood Exhibit 1                         19
     (6/28/07 letter to Joe Atwood from Randi Osberg)
     Atwood Exhibit 2                         35
     (Letter to Karl Swanson 6/27/07, citation)
     Atwood Exhibit 3                         57
     (Picture)
     Atwood Exhibit 4                         62
     (Stop work order)
     Atwood Exhibit 5                         70
     (Citations.)
     Atwood Exhibit 6                         90
     (Ordinance No. 684A)

---

P R O C E E D I N G S

J O E   A T W O O D

called as a witness herein, being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. PRINGLE:

Q    Could you state your full name for the record?

A    Joseph Ronald Atwood.

Q    And what's your address?

A    Street address, 2365 Seventh Avenue.

Q    And, uh, have you ever had your deposition taken before?

A    No.

Q    All right.  Just a few brief explanatory remarks about the process that we're going to follow today.

     I'm going to ask you a series of questions about the charges that are pending against Mr. Swanson and would ask that you respond to those questions to the best of your ability.

A    (Indicating.)

3

---

Q    And, uh, I see you're nodding.  Typically--

A    Oh.

Q    --it's saying--

A    Yes or no.

Q    Yeah.  Or just audible--

A    Okay.

Q    --so that the court reporter can take it down.  And also, it's extremely helpful to the court reporter if only one person speaks at a time.  So if you would just wait until I'm done with my question before you give an audible answer, that would smooth things along.

     Uh, what did you do to prepare for your deposition today?

A    Just went over the documents, reviewing my records from the -- uh, the incident first started when I got the first phone call from Mr. Swanson.  Just went through all my records just to make sure everything was in order.

Q    Okay.

A    Talked to Matt a little bit.

Q    Okay.  Did you speak with anyone else?

A    Just maybe some people from the City, you know, on ordinances and, uh, um, Dan Knapp on the street right of ways, and measurements and stuff like that.

4

Q    Uh, who's Dan Knapp?

A    He's the City Public Works Director.

Q    Anyone else from the City that you spoke with to prepare for your deposition?

A    Nope.

Q    Okay.  Did you speak with the Mayor?

A    No.

Q    Okay.  And I see you brought a -- a folder there.  Is that the documents that you, um, reviewed prior to your deposition?

A    Yes.

Q    Okay.  Um, what's your current position with the City of Chetek?

A    I am the U.D.C. Building Inspector.

Q    Okay.  And could you explain U.D.C.?

A    It's Unified Dwelling Code Inspector.  It's, uh -- It's codes mandated by the Department of Commerce.

And the City has an option to adopt the codes -- or the uh, U.D.C. enforces them from a State level.  And if the City adopts a code, then they hire an inspector, such as myself, to do the inspections for the City.

Q    Okay.

A    That's what a U.D.C inspector is.

5

---

Q    All right.  Uh, so is -- Are -- Are you the sole person employed by the City to do those inspections?

A    Yes.

Q    All right.  Is that a full-time position?

A    No.

Q    Okay.  Approximately how many hours a week do you work?

A    Approximately 20 hours a week.

Q    Okay.  So is that being paid as if it were a half-time--

A    I'm--

Q    --position?

A    --paid by the hour.

Q    Okay.

A    Yeah.

Q    And how long have you been the inspector?

A    Since January 1st of 2007.

Q    And were you employed by the City prior to that?

A    No.

Q    What was your prior position?

A    (No response.)

Q    Prior to becoming an inspector--

A    Oh.

6

---

Q    --for Chetek?

A    I am the fire chief in the City of Chetek -- the -- the District of Chetek.  I'm not employed by the City; I'm employed by the District.

Q    Okay.

A    And I also am employed by Jennie-O Turkey Store?

Q    Um, so you're currently the Fire Chief for the District of Chetek?

A    Yes.

Q    Okay.  And how long have you held that position?

A    Eighteen years.  (Makes noise.)  Excuse me.  I've been a firefighter for 18 years.  I've only been the chief since 2004.

Q    Okay.  So it sounds like that's sort of a separate governmental district than the city--

A    It--

Q    --is?

A    --is.

Q    Okay.

A    It is separate.

Q    And you have another job as well?

A    Yes.  Jennie-O Turkey Store.

Q    And what do you there?

7

---

A    I'm a farm manager.  I manage a turkey farm.

Q    And I take it those other two jobs are part-time jobs as well?

A    No.  It's a full-time job.

Q    Okay.

A    Uh, fire chief is just on call whenever they need you.  Turkey store is a full-time, seven days a week position job.

Q    Okay.  And what hours do you work?

A    Any hours I want.  It's very flexible.

Q    So what are your job duties for the City of Chetek?  What's the typical--

A    Um, write out building permits; enforce the building codes, um, fence ordinances; junk ordinances.  Um, that's about it.  Building permits.

Q    Okay.  What's the -- So you're responsible for issuing of building permits; is that right?

A    Yes.

Q    What's the process?

A    Um, if somebody wants to build a home, they call my office or they come to my office.  We talk about what they want to do.  We fill out a piece of paper, um, an application.  Uh, and I either -- We either approve it or we talk about what they need to do as far as

8

getting electricians, plumbers, heating people; you
know, all that kind of stuff. We just have to go
through the whole paperwork process with them.

Q.   Okay.

A.   Before they start building.

Q.   Then there's -- They pay a fee or--

A.   They pay a fee to the city.

Q.   All right. So your issuance of a building
permit is dependent upon the applicant's compliance with
the building code?

A.   Um, I don't think I understand your
question.

Q.   Sure.

A.   Okay.

Q.   Uh, so it's not -- I mean getting a
building permit is not automatic; is that right?

A.   If you -- If you building -- If you're
building a new home or an addition, you need a building
permit. It is automatic. You have to have one.

Q.   Are -- Are those (inaudible)--

A.   Or anything that's covered in the ordinance
if it says you need a permit for, you need to have one.

Q.   Okay. So -- But if -- if an applicant for
a building permit comes to you and says: Here's my $40;
issue me a permit; there's more to it than--

9

A.   Oh, yes.

Q.   --that.

A.   Yes.

Q.   Okay. And it -- it sounds like from your
prior answer that the "more to it" is you go over their
plans to ensure compliance with the code?

A.   Yes.

Q.   Okay. Is there any other reason besides
noncompliance with the code for not issuing a building
permit?

A.   Not that I can think of, no.

Q.   All right. Uh, when was the first time--
Uh, we're going to be talking about a piece
of property here in Chetek with the street address of
424 Lakeview.
Are you familiar with that--

A.   What--

Q.   --property?

A.   --was the address?

Q.   424 Lakeview?

A.   Yes, I'm familiar with it.

Q.   Okay. And -- And who owns that property
to your understanding?

A.   Karl Swanson.

Q.   All right. Do you recall the first time

10

you went to that property?

A.   Yes, I do.

Q.   And do you recall appro-- do you recall
approximately, uh, when that was?

A.   Yes. Can I look at my notes, please?

Q.   Sure.

A.   It was May 24th of 2007. May 21st.

Q.   May 21st?

A.   Yep.

Q.   And that was in your official capacity as
building inspector?

A.   Yes.

Q.   All right. And, uh, how do you come to go
to the property on that date?

A.   I was called by Mr. Swanson to come and
look at the fence. He wanted to put up a fence. And I
was called to his home to look at the area he wanted to
put the fence in; and he was asking about, you know,
does he need permits, and so forth.

Q.   Okay.

A.   He -- He wanted me to come to the property
then; and I wanted to come to the property then. When I
do a fence, I like to come and see where boundaries are
and stuff so I made arrangements to come to his house.

Q.   Okay.

11

A.   And talk about it.

Q.   Sure. Who called you?

A.   Karl Swanson.

Q.   Okay. Was he in town then, or did he call
you from out of state; do you know?

A.   I don't recall.

Q.   Okay.

A.   When he first called me, he might have
called me from out of town. But when I first met him,
he was in town.

Q.   Okay. So on that May 21 date, was he
there--

A.   Yes.

Q.   --at the property?

A.   Yeah.

Q.   And who -- was anybody else there?

A.   I believe Kathy was there.

Q.   And that's Kathy Wietharn?

A.   Yeah. I don't know her last name.

Q.   Okay. She's in the room here with us--

A.   Yes.

Q.   --too, and you've identified her.
All right. And was there anyone else
present?

A.   No.

12

1  Q   So you went out there on the 21st because
2  Mr. Swanson had called you and said he wanted to erect a
3  fence and wanted to make sure he was compliant with the
4  City Code?
5  A   Yes.
6  Q   All right.  And, uh, tell me what you
7  remember about when you got there.
8  A   Okay.  It was a very pleasant conversation.
9  Me and Karl talked very well until we got to the point
10 to where we had to, um, determine where property lines
11 were and where the fence could go.  And I -- I advised
12 him of the ordinance that the fence needed to be 3 feet
13 from the property line.  And then about that time was
14 when the conversation wasn't so pleasant anymore, and
15 then he was a little upset with, you know, having to be
16 3 feet off the property line because he felt that the
17 City was taking 3 feet from him.
18 Q   Okay.
19 A   And he said -- he asked me, uh, if he
20 needed a permit.  And I said:  Yes, you need a permit.
21 And I told him how much the permit was, told him the
22 process of getting the permit.
23     And, uh, that's about it.
24 Q   Uh, was the conversation only, uh, relative
25 to the side fence at that point?

13

---

1  A   At that point, it was just the side fence.
2  Q   Okay.
3  A   Yes, it was.
4  Q   Okay.  And, uh, there --  So we are talking
5  about the north side of the -- that property, is that--
6  A   It would--
7  Q   --correct.
8  A   --be the west side of the property.
9  Q   The west side?
10 A   (Indicating.)
11 Q   Okay.  So that would have been the side of
12 the property that -- that's, uh, next to the Mayor's
13 property, is--
14 A   Yes, it--
15 Q   --that right?
16 A   --would be.  Yep.
17 Q   All right.  And there's already a fence on
18 the -- it would be the east side of the property, is--
19 A   Yes--
20 Q   --that right?
21 A   --there is.
22 Q   Okay.  And did that come up as a matter of
23 discussion?
24 A   It did a little bit.
25 Q   Okay.  What--

14

---

1  A   Yes, it did.  Uh, Karl mentioned to me that
2  he felt that that owner has part of his mess on
3  his -- on Karl's property.
4  Q   Mm-hmm.
5  A   And we never got into that.  He said he was
6  going to resolve that with that owner, and that was the
7  end of that.
8  Q   Okay.
9  A   But he felt that his mess was 2 feet on his
10 property.
11 Q   All right.
12 A   And he was going to resolve that with him.
13 And I was never asked to look into it.
14 Q   All right.  And so you told Mr. Swanson at
15 that point he would need to obtain a permit; right?
16 A   Yep.  Yes.
17 Q   And that his -- his fence had to be -- his
18 side fence had to be 3 feet back from the property line?
19 A   Yes.
20 Q   Did, uh --  Did Mr. Swanson or -- or his
21 partner, Miss Wietharn, ever attempt to maintain a
22 building permit from you?
23 A   No.
24 Q   Uh, they never applied for a permit.
25 That's you're testimony under oath?

15

---

1  A   Nope.
2  Q   Okay.
3  A   Never applied for one.
4  Q   Did they ever subsequent to that initial
5  meeting discuss with you the issuance of a building
6  permit?
7  A   Yes, he did.
8  Q   All right.
9  A   He asked me about getting a permit; and,
10 uh, he said:  Well, what if I don't get a permit.
11    And I said:  Well, I will probably have to
12 give you a citation.
13    And he --  He asked me how much a citation
14 would cost.  And I told him what the citation would be,
15 and that was about it.
16 Q   Um, you don't recall any attempt by,
17 uh, Mr. Swanson or Miss Wietharn to obtain a building
18 permit for their fence?
19 A   They might of --  They might have asked me
20 about a permit.
21    And I told 'em, I said:  You have to have a
22 permit, and you have to be 3 feet from the property
23 line?
24 Q   Okay.
25 A   That's all I remember.

16

**Page 17**

Q   Okay.  So did they ever come in subsequent and say:  Here's our money; where's the permit?

A   Nope.

Q   All right.

A   No; no.

Q   What is the basis for your advising Mr. Swanson that his fence had to be 3 feet from the property line?

A   Just by what it states in the City ordinance.

Q   Do you have a copy of the ordinance with you?

A   Yes, I do.

Q   All right.  And could you identify the section of the ordinance that you believe requires the fence--

A   Yes.

Q   --measurement(ph).

A   It's Section 13 dash 1 dash 132, fences and hedges.  And that would be at, uh, paragraph C height of fences and regulated under parts 1 and 2.

Q   Okay.  Uh, specifically, could you identify the language there that you believe requires, uh, that the, uh, side fence be 3 feet away from the property line?

17

**Page 18**

A   I have to refer to my notes here.

That would be in Section 13 dash 1 dash 132B under fences category -- categorized, boundary fence -- the boundary fence within 3 feet of the property line of adjacent properties.

Q   Okay.  So you interpret that language as prohibiting the construction of a fence within 3 feet of a property line?

A   Yes.

Q   But it doesn't exactly say that; right?

A   No, it doesn't.

Q   All right.  And in fact, uh, the -- the City has sort of -- not sort of, they in fact modified, uh, the ordinance to make that clear, is--

A   It was unclear.

Q   --that right?

A   It was unclear.  And I had requested to go to the Planning Commission to change that language after that case.

Q   Okay.  After which case?

A   The Swanson case.

Q   Okay.

A   This was the first one I dealt with on that.

Q   Okay.  And so even though you -- you

18

**Page 19**

enforced the ordinance as requiring the fence be 3 feet away, it wasn't clear in your mind that that's what the ordinance said?

A   It wasn't exactly clear in my mind so I asked the City, um -- or City Clerk and Mr. Knapp and some other people, you know, how -- how are you interpreting this code.  And they all told me the same thing as interpreted it as 3 feet from the property line.

Q   Okay.  And did you obtain legal -- legal consultation on that?

A   Yes, I did.

MR. PRINGLE:  Could you mark that please?

(Atwood Exhibit 1 was marked for indentification.)

BY MR. PRINGLE:

Q   I'm showing you what's marked as Atwood Exhibit 1.

Can you identify that document?

A   Yes.

Q   And what is that?

A   It's just some questions I had for Mr. Osberg on the fencing.

Q   And that's his reply to you?

A   Yes.

19

**Page 20**

Q   Okay.  And some of the -- Well, what's the next time that you were out at the Lakeview property?

A   I believe it was May 31st, '07.

Q   Okay.  And you're looking at those -- It looks like some kind of spread sheet document?

A   Oh, I have to do a daily report with my hours with the City.

Q   Okay.  And what's the time frame that's covered by that document?

A   12 to -- 12:00.  Noon until one.

Q   But I mean for the whole -- for the different dates, when does it -- does that start when you started your job?

A   Yes.

Q   Okay.

A   Yeah.

Q   And -- And how current?  Is that up to date to today?

A   Yes.

Q   All right.  So that should be a pretty good record of every time you were at the Swanson residence?

A   Yes, every time I was there, I documented it.

Yes.

Q   All right.  And then would that document

20

1  your phone conversations as well?

2      A    No.

3      Q    All right.  Um, so the second time you were

4  out there was when did you say?

5      A    I believe it was May 31st of 2007.

6      Q    And what do you recall about that meeting?

7      A    Um, the fence was being put up without the

8  permit, and so I was called out.  Somebody called me and

9  said:  Um, just to let you know, the fence is up and you

10 might want to go out there.  So I went out there, and

11 the fence was being put up.

12     Q    Without a permit?

13     A    Without a permit.

14     Q    Uh, do you recall who called you?

15     A    I think it was the Mayor.

16     Q    All right.  And when he called you and said

17 you should go out there, you--

18     A    He just--

19          --went out there?

20     A    He just called and says:  I just want to

21 let you know that we're having some issues with the

22 permit, and the fence is being put up.

23          And I said thank you and went out.

24     Q    All right.  And when you say "the fence,"

25 what fence are we talking--

                    21

---

1      A    The side--

2      Q    --about?

3      A    --fence.

4      Q    All right.  What was --  Was anyone else

5  there when you got there?

6      A    I think just Kathy.

7      Q    And was the fence completed at that point?

8      A    Yes.

9      Q    And what did you do?  What did you do in

10 response to that?

11     A    Um, I told -- I think it was Kathy.  I'm

12 not sure.  I think it was Kathy.  I told her I'm going

13 to have to issue you a citation for putting up a fence

14 without a permit.

15     Q    All right.  And did you do that?

16     A    Yes, I did.

17     Q    At that point?

18     A    Um, I had --  We mailed one.  I don't have

19 the copy with me.  I have it in the police file.  I did

20 mail one on that -- close to that date, and it was never

21 received in Colorado.

22     Q    Had you sent it certified mail?

23     A    Yes.  And it came back.

24     Q    All right.

25     A    Unsigned.

                    22

---

1      Q    All right.  And what was the charge at that

2  point; do you recall?

3      A    Uh, not obtaining a permit.

4      Q    And it's your sworn testimony that, uh, no

5  one ever applied for that permit; is that right?

6      A    No one ever applied on paper for a permit.

7      Q    Okay.  Well, what do you mean by "on

8  paper"?

9      A    Uh, filling out an application for a

10 permit.

11     Q    All right.  Did Mr. Swanson or

12 Miss Wietharn ever request the form?

13     A    They might have.  They might have requested

14 a form.

15     Q    All right.  And did you give them a form?

16     A    I don't recall if I gave 'em one or not.

17     Q    Okay.  Well, there's no reason for you not

18 to give them a form if they requested one; right?

19     A    Right.  Right.

20     Q    Okay.  Um, was the Mayor more involved at

21 that -- at that point in asking you not to issue them a

22 permit?

23     A    The Mayor?

24     Q    Yeah.

25     A    No.  No.

                    23

---

1      Q    Do you recall a phone conversation where

2  the Mayor said to you, uh, Karl better have his dental

3  insurance paid up before he comes back to Wisconsin?

4      A    No.

5      Q    You don't recall that conversation at all?

6      A    With the Mayor?

7      Q    Yeah.

8      A    No.

9      Q    Have you ever heard the Mayor make any

10 derogatory remarks about, uh, Mr. Swanson or Miss--

11     A    Oh, yeah.

12     Q    --Wietharn?

13     A    Oh, yes.

14     Q    And --  And, uh, you said that rather

15 emphatically.  Did that happen on more than one time?

16     A    Yes.

17     Q    Why don't you, uh, tell us about the first

18 time you recall him saying something.

19     A    I don't recall the exact date.

20     Q    That's fine.  What do you recall him

21 saying?

22     A    Just --  I don't even recall the

23 conversation.  I just know it wasn't pleasant.

24     Q    Okay.  Who was present?

25     A    It wasn't present -- or it wasn't pleasant.

                    24

Page 25

```
1    Q    No; no.  And I'm sorry that's (stops).

2         When this conversation took place, who--

3    A    Oh.

4    Q    --was there?

5    A    Me and the Mayor.

6    Q    And was it in person?

7    A    I believe so.

8    Q    And what did he say?

9    A    I can't say word for word.  I mean, I'd be

10  guessing.

11   Q    To the best of your recollection, what did

12  he say.

13        THE DEPONENT:  Can I answer that?

14        MR. CORNETTA:  Yes.

15        THE DEPONENT:  He used some swear words,

16  and started in about him and their aunt, which is -- I

17  just tried to tone it out and tried to do my job.

18  BY MR. PRINGLE:

19   Q    Did he ever, uh, uh, suggest to you that

20  they were drug dealers?

21   A    No.

22   Q    Did he ever suggest to you that they didn't

23  pay their bills?

24   A    Uh, yes.

25   Q    All right.
```

Page 26

```
1    A    I believe he did, yeah.  At one point he

2   said make sure you get your fee up front.  I believe

3   that's what he said.

4    Q    And what did you say?

5    A    I don't know.  I just probably said, yes, I

6   will.

7    Q    Okay.  And -- And how did you interpret

8   that comment "make sure you get your fee up front"?

9    A    I think he was implying that just make sure

10  you get paid for it.

11   Q    Did you take that as suggesting that they

12  don't pay their bills?

13   A    No, I wasn't worried about it.  Like I

14  said, I was just trying to do my job; and I don't try to

15  get involved in the -- you know, so I was just listening

16  to what he had to say and doing my job.

17   Q    What else?  Was there more than one

18  conversation that you would characterize as unpleasant

19  with the Mayor concerning Mr. Swanson?

20   A    Several.  And vice versa.  Um, when I'd

21  come to Kathy -- uh, not Kathy; I'm sorry.  When I

22  talked to Karl, the conversation would go that way

23  towards Jerry also.

24   Q    Mm-hmm.

25   A    I took it, it wasn't very pleasant between
```

Page 27

```
1   the two.

2    Q    All right.  Uh, do you -- Did the Mayor

3   ever explain to you why he had personal difficulties

4   with Mr. Swanson?

5    A    A lady's name came up a lot.  I just

6   assumed it was because of that.

7    Q    Uh, did the Mayor ever express to you his

8   unhappiness or dissatisfaction with the fact that,

9   uh, Mr. Swanson was remodeling the home he bought?

10   A    You're asking me if the Mayor was

11  dissatisfied with (pauses)--

12   Q    Did he ever express that to you?

13   A    Not that I recall, no.  No.

14   Q    How many of these conversations, uh, did

15  you have with the Mayor in which he expressed some

16  hostility toward Mr. Swanson?

17   A    How many total?

18   Q    Yeah.

19   A    Probably at least ten conversations.

20   Q    And kind of over what time frame?

21   A    From the -- From the start of the fence

22  dispute right around May 21st all the way

23  through -- through that -- the first -- uh, the first

24  two months of May and June.

25   Q    And can you tell from your notes
```

Page 28

```
1   when -- when you first issued a citation?

2    A    I believe I issued the first citation a

3   little prior to -- a little close to, um, May 31st of

4   '07 because I wrote on here, um -- And I just put on

5   little notes to remind myself of he put up a fence with

6   no permit.  So that at that time, I believe I issued

7   that first citation.  And I -- I can check next door

8   with the records to see exactly what date.

9    Q    Mm-hmm.

10   A    I don't have that copy in my folder for

11  some reason.

12   Q    Um--

13   A    Because I could be wrong.  It could be--

14   Q    Yeah.

15   A    --four days.  It could be five or six days

16  off.

17   Q    If you think the file's here and we can do

18  that, why don't we just take a quick break and--

19   A    Can we do that?

20   Q    Yes.

21   A    Okay.

22        (Off the record at 9:52 a.m.)

23   (Back on the record at approximately 9:57 a.m.)

24        MR. PRINGLE:  We're ready to go back on the

25  record?
```

1    THE DEPONENT:  Yes, sir.

2    MR. PRINGLE:  All right.

3    THE DEPONENT:  And I'm sorry I was

4 mistaken.  It was later on.  It was 6/28/07 when I first

5 issued the first citation; not 5/31.

6 BY MR. PRINGLE:

7    Q    All right.  So 6/28 you issued a citation?

8    A    Yes.  And he failed to appear, and it was

9 dismissed.

10    Q    All right.  What was the charge for that

11 citation?

12    A    (Mumbling.)  Does it say on there?  I

13 believe it was just -- Yeah, it -- it's just a charge

14 of not getting a permit.

15    Q    All right.  Anything else?

16    A    It might have been erecting -- No.  It was

17 probably erecting the fence too close to the property

18 line.

19    Q    Okay.

20    A    Yeah.

21    Q    Uh, it's -- it's real important that we not

22 guess at this.

23    A    Right.

24    Q    Can you tell?

25    A    It doesn't say on there.  It just says

29

---

1 that--

2    MR. CORNETTA:  Just say-- tell him what

3 the -- It says what the violation is--

4    THE DEPONENT:  I -- I--

5    MR. CORNETTA:  --by citing the ordinance.

6    THE DEPONENT:  13-1-132.

7    MR. PRINGLE:  Okay.

8 BY MR. PRINGLE:

9    Q    And do you recall which aspect of that

10 multipart section of the ordinance which was being

11 violated?

12    A    No.  I don't recall.

13    Q    And nothing in your records reflect?

14    MR. CORNETTA:  That's -- That's not it.

15    THE DEPONENT:  I don't recall if it was not

16 having a permit or being too close to the property line.

17 I don't recall.

18 BY MR. PRINGLE:

19    Q    Okay.  Miss Wietharn, uh, remembers very

20 much coming to your office with money in her hand prior

21 to the end of June requesting a permit; and you did not

22 sell her one.

23    Is she just wrong about that?

24    A    I don't recall.  I don't recall her coming

25 in my office just with money for anything.

30

---

1    Q    Do you recall her coming into your office

2 for the purpose of getting a permit and the Mayor coming

3 in angrily at that point?

4    A    I remember when I says(ph) yes, where Kathy

5 was in my office and the Mayor came in.

6    Q    Okay.  And what -- why was Kathy in your

7 office?

8    A    I believe to discuss the fence.

9    Q    Okay.  And wasn't she trying to get a

10 permit at that point?

11    A    I don't recall if she was trying to get

12 one.  We were talking about it.

13    Q    Okay.  And presumably, if you were having

14 that discussion, you would have discussed with her the

15 need to get a permit; right?

16    A    Yes.

17    Q    All right.  And -- And there would have

18 been a form that she had to fill out.

19    Is that your testimony?

20    A    Yes.

21    Q    Okay.  And there -- You're not sure

22 whether you would give her the form or not?

23    A    I don't recall her filling out the form for

24 that.

25    Q    Okay.  That's not what I asked you.

31

---

1    A    Okay.

2    Q    I asked about did you give her the form?

3    A    I don't recall if I gave her one or not.

4    Q    Okay.  Why would you not have?

5    A    I would not have.  I just don't recall

6 giving her one.

7    Q    Okay.

8    A    If I did or not.

9    Q    All right.  You do recall an incident where

10 the Mayor came in while you were discussing the fence

11 permit; is that right?

12    A    Yes.  I don't recall what date that was.

13    Q    Okay.

14    A    But I remember the Mayor coming into my

15 office, butting in our conversation.

16    Q    All right.

17    A    I told him he had to go out and sit and

18 wait for Kathy to leave, and then I would talk to him.

19    Q    All right.  What did he say when he came in

20 your office?

21    A    I don't recall the conversation.

22    Q    Well, what was--

23    A    Actually, it had something to do

24 with -- that I was -- I wasn't talking to him as a

25 mayor; I was talking to him as Jerry Whitworth at that

32

1   time.  He just came into my office as Jerry Whitworth,

2   and just kind a wanted to talk to me.

3       Q     Okay.  Well, he -- he must have had

4   something to say about why he was there and barged in on

5   your office?

6       A     Yes.  Yes, I just don't recall what it is,

7   the conversation.

8       Q     Did it have to do--

9       A     There was so many.

10          Sorry.  There was so many conversations, I

11  just don't recall.

12      Q     All right.  That particular incident, did

13  it have to do with their fence?

14      A     Yes.

15      Q     All right.  And --  But you don't remember

16  what he said?

17      A     Not word for word, no, I don't.

18      Q     Okay.  Generally, do you remember what he

19  said?

20      A     No, I don't.

21      Q     All right.  But you do remember it was

22  about the fence?

23      A     Yes.

24      Q     All right.

25      A     Yes.

    33

---

1       Q     And you told him to leave your office?

2       A     Yep.  Yes.

3       Q     Okay.  And you said once you were done with

4   that, you would discuss the fence issue with him?

5       A     Yes.

6       Q     Okay.  And then did you have that follow-up

7   meeting?

8       A     I think he just left.

9       Q     All right.  What do you recall about his

10  demeanor when he butted into your office and he felt

11  your -- your--

12      A     He was -- He was mad.

13      Q     How could you tell?

14      A     I just can tell when someone's mad.  He was

15  red in the face.

16      Q     Speaking loudly?

17      A     Yes.  And swearing.

18      Q     Okay.  Um, backing up a little bit.  You--

19  You now, uh, reviewing the records, uh, believe that you

20  issued the initial citation on June 28th of 2007; is

21  that right?

22      A     Yes, according to the police records.

23      Q     Okay.  And you generally cite

24  Section 13-1-132, but no specific subsection?

25      A     Not generally.  That's just apparently what

    34

---

1   I did at that time.

2       Q     Okay.

3       A     That was the first permit I ever issued,

4   and I wanted to be a little more specific.

5       Q     Okay.  That's the first citation--

6       A     Yes.

7       Q     --you issued?

8       A     Yes, that's the first --  Did I say permit?

9       Q     Yeah.

10      A     Oh, I'm sorry.  It's the first citation

11  I've ever issued, yeah.

12      Q     All right.

13          MR. PRINGLE:  Okay.  Could you mark that

14  please?

15

16          (Atwood Exhibit 2 was marked for identification.)

17

18  BY MR. PRINGLE:

19      Q     Mr. Atwood, handing you what's been marked

20  as Deposition Exhibit 2, do you recognize that document?

21      A     Yes, I do.

22      Q     All right.  And is that your signature?

23      A     Yes, it is.

24      Q     And did you draft this document?

25      A     Can I read it quick?

    35

---

1       Q     Sure.

2       A     Yes, I drafted that.

3       Q     All right.  Uh, and I know by the date's

4   the 27th, which is the day before you issued a citation;

5   is that right?

6       A     Yes.

7       Q     All right.  And there's nothing in this

8   document that makes reference to the side fence;

9   is -- is there?

10      A     No.

11      Q     Okay.  Uh, I'm just a little confused if

12  the citation that you issued pertained to the side

13  fence, the letter that you wrote just the day before

14  doesn't mention the side fence.

15      A     No.

16      Q     Can you explain that?

17      A     It looks like I just issued a citation for

18  not getting -- obtaining a permit.  And during the

19  process of all this, then the front -- front part of the

20  fence was erected, so then I issued, um, it was on

21  the -- the setback from the street line at the same

22  time.

23      Q     Okay.  But I'm correct that your June 27th

24  letter doesn't mesh-- mention a side fence; right?

25      A     That would be correct.

    36

1    Q    Okay.  So the only issues that you mention
2  on the 27th of June were the failure to have a permit
3  and the front setback?
4    A    Yes.
5    Q    All right.  Now, have you ever had a
6  discussion with Mr. Swanson or Miss Wietharn about the
7  front fence prior to June 27th?
8    A    I don't recall having any discussion with
9  them.
10   Q    Okay.  Let me ask you this:  Do you recall
11 going out there and measuring out where they could put
12 their front fence?
13   A    I might have.  I might have, yes.
14   Q    Okay.  Do you --- Tell me what you
15 remember about that?
16   A    Vaguely, I just -- I remember that they
17 might have called me to come out there to ask where the
18 front fence could go.
19   Q    Okay.  And would that have been prior to
20 June 27th?
21   A    (No response.)
22   A    Well--
23   A    It might have been.
24   Q    Okay.
25   A    It might have been--
    37

---

1    Q    Why don't you look at your spread sheet
2  because that should tell you; right?
3         There's your spread sheet.
4    A    No, that's the other one.  Mine's here.
5         It was probably prior to 6/27 of '07; yes.
6    Q    Okay.  When do you think it might have
7  been?
8    A    I didn't note on here that I actually
9  measured for the fence, so it's hard to say.
10   Q    Okay.  But you do remember that?
11   A    I remember going out there and measuring it
12 several times.
13   Q    All right.
14   A    Yes.
15   Q    All right.  Uh, so who was there?
16   A    Just myself.
17   Q    Either Miss Wietharn or Mr. Swanson--
18   A    I don't remember.
19   Q    --was there?
20   A    Kathy might have been present.  I can't
21 remember.
22   Q    Well, didn't you show them exactly where
23 they could put their fence?  Prior to them putting up
24 their front fence.
25   A    Exactly where they could put it?
    38

---

1    Q    Yes.
2    A    No, I don't believe I did.
3    Q    Okay.  Did you bring a tape measure, did
4  you measure off a certain--
5    A    Yes.
6    Q    --distance?
7    A    I remember measuring something off and
8  saying here's the right of way.  You have to be 5 feet
9  from the street right of way.  I remember doing that.
10        I don't remember who was present.
11   Q    Okay.  Um, was that on one occasion?
12   A    It probably would have been --  I went out
13 there a couple of different times; I measured just to
14 make sure.
15   Q    Okay.
16   A    Because after I measured the first time, I
17 discovered that right of ways are -- streets aren't
18 always in the center of right of ways; and I did more
19 other measurements and calculations.
20   Q    All right.  All right.  All right.  Well,
21 that's -- that's interesting.
22        So you went out there one time, and you
23 measured, uh,  5 feet from the edge of the pavement;
24 right?
25   A    5 feet from the edge of the pavement?
    39

---

1    Q    Yeah.
2    A    I don't recall measuring 5 feet from the
3  pavement.
4         I was just doing measurements from the
5  center of the street.
6    Q    Okay.  It's your testimony under oath--
7    A    Yes.
8    Q    --that's all you ever measured was distance
9  from the center of the street?
10   A    I did lots of measurements, and I could of
11 done them from the edge of the road.  I've done 'em
12 from -- I did --  I did several measurements out there.
13   Q    Okay.  Why did you need to do--
14        And I'm just talking about this particular
15 property.
16        Why did you need to do several
17 measurements?
18   A    To determine where the front right-of-way
19 line was.
20   Q    Okay.  So are you saying there was some
21 confusion, uh--
22   A    Just on--
23   Q    --surrounding--
24   A    Just on my part.  You know, understanding
25 exactly where they are.
    40

1  Q    Okay.  And what was the basis for your
confusion?
3  A    Not knowing street -- You know, being new
in the position and not knowing exactly where street
right-of-way lines are.  You know, I just wanted to make
sure I was doing it right.
7  Q    Okay.  Was there some confusion on your
part about the language of the ordinance?
9  A    I'm not sure I understand your question.
10  Q    Okay.  Okay.  Under your understanding of
the ordinance, uh, where can a person build a front
fence on their property?
12  A    5 feet from the street line.
13  Q    Okay.  And what's your understanding of
"street line"?
15  A    Of "street line"?
16  Q    Yeah.
17  A    The road right of way.
18  Q    All right.  Was your understanding ever
that the street line was the edge of the pavement?
20  A    I thought at one time it was.
21  Q    Okay.
22  A    Yes, I did.
23  Q    All right.
24  A    Yeah.

41

---

1  Q    All right.  And that's in fact what you
told Miss Wietharn; right, that you could build the
fence 5 feet from the edge of the pavement; isn't that
true?
6  A    I might have.  I don't recall exactly if I
told her.
8  Q    Okay.
9  A    I don't know if I said pavement or street
line.
11  Q    Okay.  Um, and then apparently there's some
confusion in your mind that required you to come out and
remeasure; is that right?
14  A    Mm-hmm.
15  Q    And that was based on some different
understanding of what was permitted under the ordinance;
right?
18  A    Yes.
19  Q    Okay.  And in fact, the difference was
you now have an understanding that what the ordinance
really means is 5 feet from the edge of the right of
way--
23  A    Right.
24  Q    --as opposed to--
25  A    Yes.
Q    --5 feet from the edge of the pavement?

42

---

1  A    Yes.
2  Q    Did -- In -- In fact you told, initially,
Miss Wietharn that it was 5 feet from the edge of the
pavement; right?
5  A    I don't recall if I said 5 feet from the
edge of the pavement or not.
7  Q    But you may have?
8  A    I may have.
9  Q    Okay.
10  A    Yes.
11  Q    You have no reason to doubt that that's
what -- if that's what she says, that -- that she would
not be correct in that?
14  A    She could be correct.
15  Q    All right.
16  A    Mm-hmm.
17  Q    All right.  And it all kind of makes sense
because you kind of change your mind later and had to
remeasure; right?
20  A    Right.
21  Q    All right.
22  A    Yes.
23  Q    All right.  All right.
24  Did you ever do any spraying to mark off
the area?

43

---

1  A    No.
2  Q    All right.
3  A    I didn't make any marks; no.
4  Q    Okay.  How did you sort of designate when
you did measurements the various points?
6  That's somewhat of a vague question, but if
you can handle it.
8  A    I just -- I, uh, found the s-- the
property marker.
10  A    Mm-hmm.
11  A    And I just referenced off of that.
12  Q    Okay.
13  A    And then off our -- off our dataview.  That
was from the -- from our database system P.C.
15  Q    What's a database system?
16  A    It's just -- It tells us the measurements
of the streets and properties.
18  Um, I'll show you an example of one.
19  Q    Sure.
20  A    Here's an example of one.
21  Q    Okay.
22  So that's a satellite image?
23  A    Mm-hmm.
24  Q    And in fact, this is, uh, uh, the property
that we're talking about; isn't it?

44

A     Yes.

Q     Okay.  Um, these, uh, numbers on there, those are distance in feet?

A     Yes.  That's lot dimensions.

Q     Okay.

A     And then this number here is a street right of way.  Uh, 33 feet is what these -- the markings between those two lines.

Q     Well, it appears that the, uh, right of way becomes narrower in front of, uh, 424 Lakeview; is that right?

A     It's 33 feet all the way down Lakeview until it gets past the Swanson property and then it widens to 60 feet -- 66 feet I believe.

Q     Okay.  But that's not indicated on the map, is it?  Somewhere?

A     Well, if I went down farther on my dataview it would state that 66 on there.

Q     Okay.  So the right of way is roughly double what it is in front of--

A     I believe it was 65 feet or 66 feet after that.

Q     Okay.  So the right of way according to your map is 33 feet?

A     33 feet.

45

---

Q     All right.

A     And I was told that by the Public Works Director that that was not accurate to the inch.  He said it could be off by as -- as much as a foot.  So I wanted to make sure when I measured, I measured correctly; and then I had some leeway, I knew I had some leeway of a foot or so.

Q     All right.  Did you ever do a survey or have a -- arrange to have a survey done of the property lines?

A     No.

Q     When you did your measurement --  And I guess this would have to be the second time that you came out or at least the second time when you started measuring from the center of the street; right?

A     (Indicating.)

Q     You have to say yes or no.

A     Oh, yes.

Q     Okay.  So you just --  How did you determine the center of the street?

A     Just from our dataview maps.

Q     Okay.  Well--

A     And from the property marker.  I was told by the Director of Public Works that the property marker was on the edge of the road right of way; that's where

46

---

they place property markers.

Q     All right.

A     So then I measured off that.  I made myself a little note on here how to come up with that measurement.

See down on the bottom, right-hand corner?

Q     Did you measure the width of the pavement?

A     Yes.

Q     Okay.  And what's the width of the pavement?

A     33 feet --  No.  I don't think it was, uh --  I don't recall exactly what the measurement was of the pavement itself.

Q     All right.  Did you conduct or arrange to have a survey made to determine whether the pavement was directly in the center of the right of way?

A     No.

Q     Okay.  Is it possible that the pavement was not in the center of the right of way?

A     Yes, it's very possible.  And I was told by the Public Works Director that that is -- that happens quite often.

Q     Okay.  So it wouldn't be unusal for the -- the pavement to actually be on one side or the other, uh, relatively speaking of the right of way?

47

---

A     No.

MR. CORNETTA:  I'm going to object to the foundation.

And you can answer subject to the objection.

BY MR. PRINGLE:

Q     That means you can go ahead and answer.

A     Okay.  Uh, that's not unusual.

Q     Okay.

A     Because the right of way is -- the street is not always in the center of the right.  That's why I went off the property marker itself.

Q     Okay.  What --  You reference a property marker.  What --  What are you referring to exactly?

A     It's just a stake in the ground that -- that marks the property line between adjacent properties and the line -- it's the road right of way.

Q     Okay.  Which --  Where was the stake located in this particular picture?

A     Can I show you a picture?

Q     Yes, please.

A     Okay.  This is a picture of the stake.  And it was --  Here's some other drawings.  It was 1 foot from the fence.  It's right underneath that yellow marker.  It's right there where the flags are.

48

**Page 49**

1   Q   Okay.  And who, uh--

2       All right.  You took this picture?

3   A   Uh, yes.  But I don't know if I reset my

4   camera so the dates are off, so, uh, don't go by the

5   dates on the -- any of the pictures because, uh, I

6   forgot to reset the date on my camera when I took these

7   pictures.

8   Q   All right.

9   A   But yes, I did take these pictures.

10  Q   Okay.  Obviously, this wasn't -- this was

11  taken well after January 3rd--

12  A   It was--

13  A   --'07(ph).

14  A   --just the other day.

15  Q   Okay.

16  A   Excuse me.

17  Q   All right.

18  A   This one is correct.  I believe this time

19  is correct on here.

20  Q   Okay.  So obviously that was before the

21  fence was erected?

22  A   Yes.

23  Q   Who put those stakes in?

24  A   I'm not too sure.  I think, uh--

25      You mean these right here (indicating)?

49

---

**Page 50**

1   Q   Yeah.

2   A   I believe the people putting up the fence

3   put them in.

4   Q   All right.  So you would have known where

5   they were going to erect the fence; is that right?

6   A   Yes.

7   Q   So what did you do in response to that?

8   A   Just advised Karl that it had to be 3 feet

9   from the boundary line at this mark right here

10  (indicating).

11  Q   And how did you -- how did you advise him

12  of that?

13  A   I just told him.

14  Q   By telephone--

15  A   Oh.

16  Q   --in person?

17  A   Uh, it could have been on the phone.  I've

18  been with him a couple of times, but we talked on the

19  phone several times, too.  But I don't really recall

20  which -- if it was face to face or by phone.  I just

21  advised him of that, yes, the ordinance, that my

22  interpretation, you have to be 3 feet from the property

23  line.

24  Q   All right.  Can you think of any reason why

25  you wouldn't have mentioned that when you wrote him a

50

---

**Page 51**

1   letter on the 27th of June?

2   A   Probably because I told him prior to that.

3   I think he understood.  He knew that it had to be

4   3 feet.

5   Q   All right.  Um, how many times did you go

6   out and remeasure on the front fence?

7   A   Two or three times probably.  Just wanted

8   to make sure I had it right.

9   Q   Okay.  So it's confusing to you?

10  A   It was at first.

11  Q   Okay.

12  A   Yes.

13  Q   Uh, and again, the first measurement was

14  just 5 feet from the edge of the pavement?

15  A   It could have been, yes.

16  Q   All right.  And then later, you thought

17  about it or talked to somebody else and you had a

18  different interpretation--

19  A   Yes.

20  Q   --of the ordinance?

21  A   I didn't know that the marks could have

22  been -- could be off on our dataview.  I was trusting

23  our dataview, and I was corrected afterwards when I had

24  mentioned that.

25  Q   Okay.  Well--

51

---

**Page 52**

1   A   Then I was told to go by property -- by the

2   property marker.

3   Q   Okay.  As opposed to the edge of the

4   pavement?

5   A   Yes.

6   Q   All right.  And obviously the front fence

7   was erected at some point?

8   A   Yes.  And, uh, again I just received a

9   phone call saying that the front fence is up.

10  Q   What did you do?

11  A   I went out; and yes, it was up.

12  Q   Then what'd you do?

13      Well, let me back up.  Who called you?

14  A   I believe it might have been the Mayor.

15  Q   Okay.

16  A   I mean Jerry Whitworth.

17  Q   Yeah, I understand.  And obviously, he was

18  the Mayor at that point?

19  A   Yes.

20  Q   All right.  So do you remember when that

21  conversation was?

22  A   For the front fence?

23  Q   Yeah.

24  A   It had to have been prior to, um, 6/28

25  because that's when I sent the citation for the front

52

fence violation.  It was shortly after that.  So it had

to have been somewhere between May 1st and June 28th.

     Q    Do you know when the fence was erected?

     A    No.  No.

     Q    Um, so did you ever have a conversation

with Mr. Swanson and Miss Wietharn after the fence was

up concerning it's location?

     A    Yes.  I believe it was with both of them.

     Q    Okay.  Do you recall shaking hands with one

or the other of them and saying the fence looks great?

     A    I might have.

     Q    All right.  But in fact, you're now telling

us that the fence was in the wrong place?

     A    Well, it was in the wrong place from the

get-go mainly.  That was our conversations; it was

always in the wrong place.

     Q    Okay.  You never shook their hands and said

the fence looks good?

     A    I might have said it looked nice, but I

didn't say it was in the right spot.

     Q    Okay.

     A    I was just being -- I was being friendly.

     Q    All right.

     A    Yep.

     Q    In fact, the first time that you ever

53

---

notified them that it was -- wasn't in the right

location was on June 27th; isn't that true?

     A    The first time I notified them?

     Q    Yeah.

     A    That it was not in the right location was

on June 27th?

     Q    Yeah.

     A    It was prior to that.

     Q    All right.

     A    Oh, you mean as far as the citation?

     Q    No.  As far as giving them any kind of

notice that the fence wasn't in the right place.

     MR. CORNETTA:  I'm going to object based on

the form of the question.  We're not clear whether it's

the side fence you're talking about now or the front

fence, so.

     MR. PRINGLE:  Now I'm talking about the

front fence.

     MR. CORNETTA:  Okay.

     THE DEPONENT:  Could you restate the

question for me please?

     MR. PRINGLE:  Sure.

BY MR. PRINGLE:

     Q    Prior to this letter of June 27th, 2007,

had you given them any notice that the front fence was

54

---

incorrectly placed?

     A    I don't recall.  I -- I mean probably not,

no.  I don't think I did.  No.

     Q    Well, this meeting where you went out and

shook hands and congratulated him on -- on the fence was

before June 27th; right?

     A    I don't recall it was a congratulations.  I

just met Mr. Swanson.  I shake hands with everybody when

I meet 'em.  And I might have told him that his fence

looked nice, yes.

     Q    But you don't recall telling him:  It looks

nice, but it's in the wrong place?

     A    No, I don't recall that.

     Q    Okay.  Do you recall going out after

June 27th and doing some more measurements on the front

fence as to where it could permissibly be?

     A    After June 27th?

     Q    Yeah.

     A    I might have.

     Q    Why would you keep going out and

remeasuring?

     A    Just to see where it actually ended up.  I

wanted to document where it actually ended up.

     Q    Okay.  How far into the right of way does

it encroach?  Did you determine--

55

---

     A    Approximately--

     Q    --that?

     A    --5 feet in the right of way.

     And I have some photos of that.

     Q    Okay.  How did you determine that?

     Well, okay.  Let's start with if you've got

photos, let's take a look.

     A    The yellow marker is the property line

marker.  This mark in the stone is where that yellow

marker is.  That is the edge of the road right of way.

And the fence is approximately 5 feet into the road

right of way if you measure from that yellow marker to

that corner of the post.

     Q    And how did you determine that location?

     A    By this marker.

     Q    So you just went from the -- uh, I don't

know what the correct term would be, the corner marker?

Are we talking about the same thing?

     A    The corner property marker, yes.

     Q    And went 5 feet back from that?

     A    No, that is the marker.  Right there where

the yellow thing is; that's where the property marker

is.

     Q    Okay.

     A    So I measured from there out.  That is

56

correct.

Q    So then you -- you--

We should probably mark this as an exhibit since we're going to talk about it so much.

So in other words, this is the edge of the right of way?

A    Yes, right where that yellow marker is.

Q    So you're saying the fence would have to be 5 feet--

Back this way yet (indicating), farther.

Q    Okay.

A    Yeah.

MR. PRINGLE:  Why don't we take a break. Can we --  I don't think they make photocopies here.  I don't think I saw the copier.

MR. CORNETTA:  No.  Well, can you make more copies of that photograph, Jason?

MR. BRYAN:  Yeah.

MR. CORNETTA:  Just make more copies and mark this as an exhibit then.

MR. PRINGLE:  Okay.

MR. CORNETTA:  I --  I--

MR. PRINGLE:  Okay.  That's good.

Mark that please.

(Atwood Exhibit 3 was marked for identification.)

57

---

BY MR. PRINGLE:

Q    Okay.  Just so it's real, real clear on the record what we're talking about; we have been discussing Deposition Exhibit 3; right?  For the last five minutes.

A    Yes.

Q    And that's a picture that you took?

A    Yes.

Q    Is that correct?

And it has a date of January 3rd, 2004, but that's not when it was taken; right?

A    Correct.

Q    And to the best of your, uh, memory, when was this picture taken?

A    Two days ago.

Q    Two days ago?

A    Yes.

Q    All right.  And was anybody with when you took it?

A    No.

Q    Okay.  And you did that in preparation for the deposition?

A    Yes.  I thought some photos would be handy.

Q    Okay.  And again the level that's --  I think that's a level; right?

A    That's a level.

58

---

Q    Yeah.  It's--

A    A foot level.

Q    It's in the snow, uh--

A    Yes.

Q    You believe that that is the edge of the right of way; is that correct?

A    Yes.

Q    Okay.  And you determined that, uh, by measuring 5 feet from the stake in the ground which was the measurement of the corner of the lot?

A    No.

Q    No?

A    I don't.

Q    Okay.  You're right.  And that's my fault. Tell me again exactly what this shows?

A    This shows the level--

Q    Okay.

A    --sitting on this marker, on the corner marker--

Q    Okay.

A    --which I believe is the road of right-of-way line.  This marker marks the right-of line. It marks the side --  It marks the properties on the side, and it marks the front line of way.

Q    Okay.  So 30 feet, 3 feet outward from this

59

---

location, then would it be the other boundary of the City's right of way?

A    Yes; 33 feet from that location, yes.

Q    And so according to your interpretation of the order, then the front fence would be required to be 5 feet from the edge of the right of way; is that right?

A    Yes.  Yes.

Q    Further toward the house?

A    Yes.

Q    All right.  All right.

And if I could reference this ped right here (indicating) from the telephone company, they most -- most of the time they put their peds on the right-of-way line just -- just so you had a reference. And these trees here or on the right-of-way line, too.

Q    All right.  Um, so you reference the ped.

And I assume you mean this sort of green phone box--

A    Yes.

Q    --right?

A    Yes.  They usually place that on the edge of the right of way.

Q    Okay.  Uh, and it looks like the neighbor's fence comes right up to the ped; right?

A    Yes.

60

1    Q    And so under your interpretation of the
2  ordinance, then that would be a -- a fence in violation;
3  right?
4    A    Correct.
5    Q    Okay.  And have you cited that neighbor for
6  having a fence in violation?
7    A    No, because I believe the fence was erected
8  before the ordinance was in place.
9    Q    Okay.  When did the ordinance come --  When
10 did the ordinance become enacted?
11   A    For the fence?
12   Q    Mm-hmm.
13   A    I'd just be guessing.  I believe it was
14 around 1984.  I might be wrong on that.  Just from
15 conversation.  Carmen would know, the -- the secretary
16 for the City.
17        MR. CORNETTA:  And I'll add this will be a
18 public record that we'll all know--
19        MR. PRINGLE:  Sure.
20        MR. CORNETTA:  --despite what you say.
21        THE DEPONENT:  Yes.  And I just -- for
22 some -- some reason, '84 sticks in my mind, but I could
23 be wrong.
24 BY MR. PRINGLE:
25   Q    So do you know for a fact that that fence
          61

---

1  was constructed prior to 1984, or whenever the effective
2  date of the ordinance was?
3    A    Yes.
4    Q    How do you know that?
5    A    Uh, just from conversations with owners?
6    Q    Did you do any independent investigation on
7  that?
8    A    No.  Just -- Just asking questions.
9        MR. CORNETTA:  Let's take a two-minute
10 break?
11       MR. PRINGLE:  Sure.
12       MR. CORNETTA:  To consult with my client.
13       (Off the record at 10:32 a.m.)
14
15       (Back on the record at 10:36 a.m.)
16       MR. PRINGLE:  We're back on the record.
17       Mark that please.
18 (Atwood Exhibit 4 was marked for identification.)
19 BY MR. PRINGLE:
20   Q    I'm handing you Atwood 4 and asking you to
21 identify that document.
22   A    This is a stop work order document.
23   Q    Um, and is that your -- on the second
24 page--  Actually, this is a larger document that was
25 photocopied in halves; is that right?
          62

---

1    A    Yes.
2    Q    All right.  Is that your signature there?
3    A    Yes.
4    Q    Okay.  And what did you do when you
5  completed this document?
6    A    Repeat the question?
7    Q    Yeah.  And you filled--
8    A    Oh.
9    Q    --this out?
10   A    --yes, I did.
11   Q    And what did you do with it?
12   A    I brought it over to the Swanson residence?
13   Q    Okay.  And did you post it some place?
14   A    I believe --  I don't know if --  I can't
15 remember if I handed it to somebody, to Kathy or if I
16 gave it to the workers that were working there in the
17 yard.
18   Q    Okay.  It's dated June 27, '07.
19       Is that when you did this?
20   A    Yes.
21   Q    Okay.  You say the workers working in the
22 yard.  Uh, what kind of workers were working in the
23 yard?
24   A    I believe there was somebody planting trees
25 in the yard.
          63

---

1    Q    All right.  Uh, and then did you take steps
2  to, uh, stop those workers from planting trees?
3    A    I attempted to, yes.
4    Q    Okay.  Tell me what you remember about
5  that.
6    A    I just remember going out there and they
7  were starting to plant trees.  They were going to put
8  'em closer than 3 feet from the property line, and I was
9  putting a stop order on planting of the trees.  And I
10 told 'em they had to be 3 feet from the property line.
11   Q    Was--
12   A    The side property line.
13   Q    Okay.  Uh, was the Mayor involved at this
14 point?
15   A    I don't recall if he was or not.
16   Q    All right.  You indicated there were
17 approximately maybe ten encounters that you had with the
18 Mayor over this property?
19   A    After he called me and told me that, yes,
20 he probably -- he was involved.  If that's what you
21 mean.  He probably did call me and tell me that there
22 was some tree planting going on and that's why I went
23 out there and did see that they were; yes.
24   Q    Okay.
25   A    If that's what you mean by his involvement.
          64

1    Q    Okay.  Well, so what was wrong with them

2  planting trees on the yard?

3    A    They had to be 3 feet from the property

4  line.

5    Q    Okay.  What's -- What's your basis for

6  that -- taking that position?  Is that the code

7  somewhere?

8    A    Yeah.  Just on shrubbery -- shrubbery and

9  trees.

10    Q    All right.

11    A    That's how it is.

12    Q    Okay.   Could you tell us where in the code

13  that's an issue.

14    A    13 dash 1 dash 132(a).

15    Q    And are there other provisions in the code

16  that suggest that you could plant shrubbery or trees

17  anywhere on -- on the property?

18    A    I think you could plant them anywhere you

19  want other than the 3-foot from the property line; and

20  then there's -- there's stipulations on intersections.

21    Q    All right.

22    A    That are as far as heighth.

23    Q    And where is that section?

24    A    For intersections and stuff?

25    Q    Yeah.

65

---

1    A    Well, it's not too far off of there.

2  (Looking through pages.)  It's just kind of hard to

3  find.   It says 2 and a half feet -- It says 2 and a

4  half feet for heighth somewhere.  (Looking.)

5        Oh, it's right here.

6        Heighth of fences --  Heighth of fences

7  regulated--

8        I don't know where the prior page is at.

9  I've got it under Section C.  (Looking.)

10        MR. CORNETTA: It's not a continuation of

11  any of--

12        THE DEPONENT: Yeah--

13        MR. CORNETTA: --those.

14        THE DEPONENT: --I know.

15        MR. CORNETTA: All right.

16        THE DEPONENT: Was it right -- Was it a

17  continuation of this one?

18        MR. CORNETTA: Yes.

19        THE DEPONENT: Okay.

20        MR. CORNETTA: Where it says 132 (c) -- (3)

21  of (c).

22  BY MR. PRINGLE:

23    Q    Let me read that.

24        No such structure or shrubbery in any yard

25  of a corner lot within 25 feet of the corner of such lot

66

---

1  is at the street intersection shall be higher than 2 and

2  a half feet above the ground.

3        All right.  Well, first of all, that

4  wouldn't seem to apply to this case.  We're not talking

5  about a corner lot; right?

6    A    No, we're not.  No, it doesn't apply to

7  this case.

8    Q    Okay.  I'm a little confused.

9        MR. CORNETTA:  Well, I think we got off on

10  a segue.

11        THE DEPONENT:  Well, I thought you asked me

12  if there was anywhere in the code that pertained to

13  heighth of shrubbery.

14        Did you -- Didn't you ask me that?

15  BY MR. PRINGLE:

16    Q    No.

17    A    Oh.

18    Q    I'm talking about the location of

19  shrubbery.

20    A    Location.  Okay.

21    Q    Yeah.

22        MR. CORNETTA:  Uh, just to clarify.

23  The -- The line of questioning, the answer was:  The

24  shrubbery can't be within 3 feet.  And -- And the

25  question was:  Where do you get that in the code?

67

---

1        And Mr. Atwood answered 13 dash 1 132(a),

2  which defines a fence for the section as shrubbery as

3  well.

4        MR. PRINGLE:  Okay.

5        MR. CORNETTA:  I think it's the

6  association, and he's applying that.  And if you want to

7  follow up on that.

8        MR. PRINGLE:  Sure.

9  BY MR. PRINGLE:

10    Q    All right.  Do you have Section 13-1-130(f)

11  there?

12        MR. CORNETTA:  Could you tell us the name

13  of that?

14        MR. PRINGLE:  It's under Accessory Uses or

15  Structures Arc(ph).

16        THE DEPONENT:  Okay.

17        MR. CORNETTA:  This is all the code section

18  you--

19        THE DEPONENT:  Yes.

20        MR. CORNETTA:  --have?

21        THE DEPONENT:  That's all that I have here.

22  BY MR. PRINGLE:

23    Q    Okay.  Why don't you just take a look.

24    A    Okay.  What code were you referring to?

25  130(f)?

68

Q    Yes.

A    Landscaping and Decorative Uses?

Q    Yeah.  Why don't you go ahead and read that.  Out loud.

A    Accessory Structures and--  (Court reporter interrupts.)  Acc--  f. Landscaping and Decorative Uses.  Accessory structures and vegetation use for landscaping and decorating may be placed in any required yard area.  Permitted structures and vegetation include flag pole; ornamental light standards; lawn furniture; sun dials bird baths; trees; shrubs and flowers and gardens.

Q    Would --  Would you agree with me that under this section that trees and shrubs used as landscaping can go anywhere on the property?

A    (Softly reading to himself.)  Required yard area, what I interpreted.

Q    Okay.  Well, how do you interpret that?

A    It doesn't say anywhere in the yard.  It just says required.

Q    Okay.  Well, under what circumstances would there be a required yard?

A    I'm not sure.

Q    Okay.  And would you agree with me that under this provision of the ordinance that there's nothing about a 3-foot setback here; right?

69

---

Q    In this particular section?

A    Yeah.

A    No.

Q    And if you just read this section, it would indicate that it could be anywhere in the required yard area; right?

A    Yes.

Q    All right.  Would you agree with me that there's some ambiguity or confusion between this section and the fence section that we just talked about?

A    There could be, yes.

MR. PRINGLE:  Would you make that, please?

(Atwood Exhibit 5 was marked for identification.)

BY MR. PRINGLE:

Q    Okay.  And before I go on to this, I just want to clarify the issue that you had on June 27th when you went out to the property and there were people planting trees and you stopped that was because you deemed or considered the shrubs that were being planted as a fence.

A    Yes.

Q    Okay.  And as a fence according to your interpretation of the former ordinance, it couldn't be closer than 3 feet to the property line?

A    Yes.

70

---

Q    Is that still your interpretation of the ordinance?

A    As of today?

Q    Yeah.

A    No.

Q    Why?  What's different?

A    We changed the ordinance.

Q    Okay.  And what -- when did the new ordinance go into effect?

A    Um, I didn't bring the new ordinance.

Q    Was it--

A    It was after the -- It -- It was after this, is all.

Q    Okay.  It was fall of '07; probably about October.

Does that sound right to you?

A    Yeah, a couple of months ago; yes.

Q    Okay.  And what do you know about -- Were you involved in the ordinance being changed?

A    Yes.

Q    Okay.  And how were you involved?

A    I was part of the Planning -- Chairman of the Planning Commission.  I -- I brought it to the Planning Commission asking for some clearer language on fence -- fences.

71

---

Q    Okay.  And why did feel that clearer language was necessary?

A    From Mr. Swanson's case and from others, a couple of other cases that came since I took over the position.

Q    Okay.  What other cases?

A    I'd have to refer back to my notes, but there was a couple of other ones that requested to put their fence on the property line.

Q    And what was your response to those requests?

A    At the time, 3 foot from the property line.

Q    All right.  And they in fact put their fences 3 feet from the property line?

A    I'd have to look back at the cases.

Q    Do you recall ever issuing any citations, uh, anytime while you were the building inspector with respect to the location of a side fence?

A    None.  None other than Mr. Swanson's home.

Q    Have you done any inspections to determine if there are other fences, side fences not in compliance?

A    Official inspections?

Q    Yeah.

A    No.

72

1  Q    Is it safe to say that the reason why this
2  became an issue was because the Mayor lived next door
3  and he was unhappy with that fence?
4  A    No.  It's not because of the Mayor, no.
5  Q    Okay.
6  A    No.
7  Q    Certainly it was the Mayor that made it a
8  major issue as far as you doing your job.
9       Is that fair it say?
10 A    Yes.
11 Q    I mean, you didn't discover this on your
12 own just in terms of going out and doing inspections?
13 A    Oh, I would of.  I would of -- I would of
14 known from -- From the beginning of the process, I
15 would have known that, you know, that was what the
16 rules -- ruling had to be.
17 Q    Yeah.
18 A    Whether the Mayor lived there or not.  If
19 it was other than Mr. Swanson, someone else was applying
20 for it, I would have gone to review it.
21 Q    You would?
22 A    Yes.
23 Q    All right.  Um, so you have to go around
24 and do inspections, not in response to anybody's
25 complaint about various aspects of--
           73

1  A    If somebody--
2  Q    --the complaint?
3  A    --complains about something, yes, I do a
4  follow-up inspection on it.
5  Q    Okay.  So you only respond to complaints;
6  is that right?
7  A    Yes.  Or if I happen to be driving through
8  the city and notice something.
9  Q    Okay.  I'm handing you, uh, Exhibit 5.
10      Do you recognize that document?
11 A    Yes, I do.
12 Q    And could you describe it for us?
13 A    It was the two citations I sent for, uh,
14 um, code violations 5 feet from the street, uh, right of
15 way; and the other one was, uh, for a failure to obtain
16 a permit.
17 Q    Okay.  And actually, there are -- there are
18 three--
19 A    There's--
20 Q    --citations?
21 A    --three of them, yes.
22 Q    And the second page is the third citation--
23 A    Yes.
24 Q    --right?
25 A    And that was for, um, boundary fence
           74

1  violation of 3 feet from the property line.
2  Q    And this obviously was issued before the
3  ordinance was changed to make it clearer--
4  A    Yes--
5  Q    --correct?
6  A    --it was.
7  Q    All right.  Who -- Did you fill these out
8  yourself?
9  A    Yes.  I had some help from the Police
10 Department.
11 Q    All right.  Who helped you?
12 A    I believe it was Kathy Davis.
13 Q    And she's the -- What's her job?
14 A    She's, uh, the secretary or clerk, I
15 believe.  I'm not too sure what she does.
16 Q    Okay.  It's the same Kathy Davis that has
17 her name tag that says "Court Clerk" there?
18 A    Yes.
19 Q    And you understand she's also the secretary
20 for the Police Department?
21 A    I believe so.
22 Q    All right.
23 A    Yeah.
24 Q    And so what help did she give you in
25 filling--
           75

1  A    Just--
2  Q    --out this--
3  A    Just--
4  Q    --citation?
5  A    --helped me to fill it out the proper way.
6  And like -- like I said, I had never wrote one before,
7  and she kind a helped me through it.  And then we looked
8  up the codes and filled out the citations.
9  Q    All right.  So in terms of identifying
10 specific code violations, she helped you with that;
11 right?
12 A    Just filling it out on the paper, yes.
13 Q    Okay.  Well, specifically, you know, each
14 one has a reference to the Municipal Code with sections
15 and subsections; right?
16 A    Yes, it does.
17 Q    Okay.  And -- And you weren't familiar
18 enough with the code at that point to identify those
19 yourself?
20 A    I identified them.  She just helped me to
21 fill out the citations themselves.
22 Q    Okay.  So it was kind of a collaboration
23 between the two of you?
24 A    Yes.  Yep.
25 Q    Prior to--
           76

Okay.  Let's -- Let me strike that.

Back when you went out on the 27th and the tree planters were there, do you remember if the Mayor was there or not?  I can't remember if I asked you that.

A    Yes.  And I -- I don't recall if he was there.  I -- I be--  I remember him calling me and telling me that they were planting shrubs, but I can't remember if he was actually there on the property.

Q    Okay.  And, um, did you advise the workman that they risk some kind of legal consequences if they continued to--

A    Yes, I did.

Q    --plant trees?

A    Yes, I did.

Q    All right.  What -- What did you tell them?

A    I just believe --  I believe I told them I'm putting a stop work order on the shrubs if you're going to plant them closer than 3 feet to the property line.

Q    Okay.  And they stopped; is that right?

A    Yes.

Q    And as of the 27th of June, was that the first notice that you gave to Mr. Swanson or Miss Wiethorn regarding the location of the front fence?

A    Yes.

77

---

Q    I'm going to take a little break here.  And we may be close to wrapping up.

Off the record.

(Off the record at 10:55 a.m.)

(Back on the record at 10:59 a.m.)

MR. PRINGLE:  Ready to go back on the record?

BY MR. PRINGLE:

Q    Okay.  So you got a call from the Mayor saying that they were planting trees?

A    I believe so, yes.

Q    Okay.  And how soon after that did you go out to the property?

A    I believe I went out immediately.

Q    All right.  And in fact, the Mayor and his then wife were present; do you recall that?

A    No, I don't.

Q    You don't remember the Mayor calling out to you:  Do you want me to call the police?

A    No, I don't.

Q    Did you identify a location at that point in time where the trees could go?

A    I might have just told 'em:  Plant 'em anywhere you want as long as they're 3 feet from the

78

---

property line.

Q    You didn't tell them that they had to be at least 7 feet from the property line?

A    No.

Q    And that would have just been completely arbitrary; right?

A    Arb--  Arbitrary?

Q    Um, that would have been at just a --  If you had said that, that wouldn't be found in the code anywhere--

A    Right.

Q    --would it?

A    Right.

Q    It would have been just been sort of a made up rule; right?

A    I didn't say that, that -- that I recall.

Q    Okay.  And if you had said it, that would have been just something that you made up on the spot; right?

A    I didn't say it.

Q    You're sure of that now?

A    Yes.

Q    Tell me more about the process for amending, uh, the ordinance regarding side fences.  You -- You indicated previously that you were very much

79

---

involved in that; right?

A    Yes.

Q    And that you headed some kind of committee?

A    Yes, Planning Commission.

Q    Okay.  And is that another responsibility that you have for the City on an ongoing basis?

A    Yes.

Q    And who's on the Commission?

A    Um, do you want me to state everybody that's on the Planning Commission?

Q    Uh, yeah.

A    Okay.  I believe it's Bob Dewey; Jerry Whitworth; Dale Wacker.

I can't recall their names.

Q    All right.  Obviously, we know who Jerry Whitworth is.  Are these other people just citizens of the town of Chetek?

A    Yes.  And I don't --  I don't know if Jerry is an official memeber of the Planning Commission.  He comes to our Planning Commission meetings.

Q    Okay.  Was he involved in this particular aspect of the Planning Commission's activities in terms of pushing an amendment of the ordinance?

MR. CORNETTA:  Object to the form of that question.

80

1    You can answer subject to the objection.

2    THE DEPONENT:  I don't believe he was

3 involved in it.  It was my doings.  I'm the one that

4 brought it before the Commission.

5 BY MR. PRINGLE:

6    Q    Okay.

7    A    And I don't recall if he was at the actual

8 meeting where we did it.

9    Q    The council meeting?

10    A    Yeah -- or no.  The Planning Commission

11 meeting.

12    Q    The Planning Commission.  Okay.

13    So are you an official of the Planning

14 Commission?

15    A    I guess I'm just the chairperson.

16    Q    All right.  So you thought it was something

17 the Planning Commission should do to amend this

18 ordinance?

19    A    Yes.

20    Q    And that was because primarily the Swanson

21 situation, but there may have been some other--

22    A    Yes.

23    Q    --where there was some confusion?

24    A    Yes.

25    Q    And that was your professional opinion?

81

---

1    A    Yes.

2    Q    All right.  Um, so how did you draft the

3 new language; how do you come up with that?

4    A    As a Planning Commission.  We drafted it

5 together.  We brought it to Council, and Council has to

6 approve it.

7    Q    Okay.  And when you say "council", you're

8 c-o-u-n-c-i-l as in city council?

9    A    City Council.

10    Q    Okay.  Did you get any legal consultation

11 in connection with the language?

12    A    Yes, we did.

13    Q    And where in the process did that come?

14    A    I'm not too sure.  I think after we drafted

15 it, Carmen sent it down to Randi or somebody, and then

16 it come back; then it goes to Council.

17    Q    Okay.  So it went to --  That's Mr. Osberg?

18    A    I believe so, yes.

19    Q    And he reviewed it and sent it back to you?

20    A    I believe so.

21    Q    Were there any changes made?

22    MR. CORNETTA:  Now I'm going to object to

23 the extent that your answer is going to lead to any sort

24 of client communication, attorney/client, I don't want

25 you to answer.

82

---

1    Just to say changes were made, that's fine.

2    THE DEPONENT:  Changes were made in the

3 language after initial review.

4 BY MR. PRINGLE:

5    Q    Okay.  And then at that point, it was

6 submitted to the City Council?

7    A    Yes.

8    Q    And generally we'd be talking about the

9 fall of 2007; is that right?

10    A    Yes.  The date is on the document.  I'd

11 have --  I could get an exact date for you if you needed

12 to; but I believe it was around in the fall sometime.

13    Q    Okay.  But generally what we're talking

14 about is a multistep, at least three different--

15    A    Oh, yes.

16    Q    --aspects?

17    A    Yes.

18    Q    I mean initially there was a meeting of the

19 Planning Commission?

20    A    (Indicating.)

21    Q    And the --

22    A    Yes.

23    Q    As I understand your testimony, the new

24 language was generated at that meeting.

25    A    Yes.

83

---

1    Q    And then it was sent to your legal counsel?

2    A    Yes.

3    Q    And I assume there was some period of time

4 before it was returned to you; right?

5    A    Yes.

6    Q    And then after it was returned, then it was

7 submitted --  Was there a special meeting of the

8 Council, or did you just--

9    A    I believe it was just on the agenda.

10    Q    Okay.

11    A    We put it on the agenda, yes.

12    Q    At the regular meeting?

13    A    At the regular board meeting, yes.

14    Q    And how often does the Council, City

15 Council meet?

16    A    Once a month.

17    Q    All right.  So this whole process it sounds

18 like would have taken weeks or months, basically?

19    A    It probably took a couple of months.

20    Q    Okay.  And did you have any discussions--

21 Strike that.

22    Did you go to the City Council meeting

23 where the new ordinance was approved?

24    A    I believe I did, yes.

25    Q    And did you address the Council?

84

1    A    They might have asked me a couple of
2  questions on why we did it.  And then I might have
3  addressed them.  I'd have to look back at the minutes.
4    Q    All right.  Uh, you say you might have;
5  what do you mean?
6    A    Yeah.  I might have.  They might have asked
7  me why we did it; why I wanted the changes.  And I
8  probably told 'em.
9    Q    All right.  Well, this is just a few months
10 ago we're probably talking about; right?
11   A    Yeah.  I'm sorry.  I just don't remember.
12   Q    It's not likely that you would invent that
13 or say that if there wasn't some basis for it, I assume?
14   A    Invent what?
15   Q    This discussion that may have occurred with
16 the--
17   A    Oh.
18   Q    --City Council.
19   A    It -- It may have.  Yeah, it may have.
20 They might have asked me a couple of brief questions on
21 it.
22   Q    Okay.
23   A    It wasn't lengthy.
24   Q    All right.  Do you recall what you might
25 have explained to them in response to their questions?

85

---

1    A    Sorry, no; I just don't recall.
2    Q    As far as you know, was the meeting on the
3  record?
4    A    Yes.
5    Q    And do you know how the record is kept of
6  the city council meetings?
7    A    No.  No.
8    Q    I mean is there like--
9    A    Somebody's taking minutes.
10   Q    --a stenographer, is a secretary taking
11 minutes or is there tape recordings?  Do you know that?
12   A    I think it's tape recorded.  I'm not sure.
13   Q    All right.  So this probably would have
14 been in Spetember of 2007; does that sound--
15   A    It might have been?
16   Q    All right.  And you're fairly sure it was a
17 regular meeting, it wasn't a special meeting just for
18 this purpose?
19   A    I think it was a regular board meeting.
20   Q    Okay.  Who's the secretary for the Board;
21 do you know?  Or the City Council?
22   A    I think it's Carman.
23        I think.
24        THE DEPONENT:  Isn't it?
25        MR. CORNETTA:  (Indicating.)

86

---

BY MR. PRINGLE:
2    Q    Did Mr. Swanson's name come up at that
3  meeting; do you recall?
4    A    I don't recall.
5    Q    Are you enforcing the new ordinance?
6    A    Yes, I am.
7    Q    And tell me how you're doing that?
8    A    Um.
9    Q    I mean if somebody came to you, you would
10 advise them now the fence has to be 3 feet from the
11 property line?
12   A    Yes, but there's some wording in there that
13 they may apply for a variance.  So with special
14 permission if we see if it's okay, we will allow it to
15 be on the property line, right on the property line.
16   Q    Okay.  How -- What -- What conditions
17 would have to apply for that fence--
18   A    Um--
19   Q    --to have a variance?
20   A    A survey, a documented survey; agreement of
21 both neighbors.  They just kind of left it up to the
22 building inspector to okay it if I felt it was okay.  If
23 there were no disputes on proper lines or (stops).
24   Q    Okay.  If it sounds like then your approval
25 of a variance under the current version of the ordinance

87

---

1  depends upon the agreement of the neighbors?
2    A    It could be.  It could be.  Yes.
3    Q    Well, is there any circumstance in which
4  you would approve a variance to allow a fence directly
5  on the property line if the other neighbor objected?
6    A    I don't understand the question.
7        MR. CORNETTA:  I'm going to object to the
8  form of the question.
9        I'd like to -- The way I'm understanding
10 "variance" being used here, there must be some mistake
11 about what the City Council is asking because the
12 building inspector has no power to approve a variance.
13       THE DEPONENT:  Right.
14       MR. CORNETTA:  So--
15       THE DEPONENT:  I -- I can approve the
16 fence to be on the property line, or they can go apply
17 for a variance.
18 BY MR. PRINGLE:
19   Q    Okay.
20   A    To go on the property line.
21   Q    Okay.  But you -- They don't have to do
22 that.  You can approve--
23   A    I can--
24   Q    --it--
25   A    --approve it.

88

1    Q    --on the property line?

2    A    Yes.

3    Q    And that's under the new ordinance?

4    A    Yes.

5    Q    And -- Okay.  So for your personal

6  approval, what are the conditions that are required?

7    A    I would have -- I would make sure that the

8  property line was correct, as -- as per a survey; and

9  that, uh, it didn't interfere with any, uh, obstruction

10  of pulling out of the driveway or traffic obstructions,

11  or, you know.

12         Haven't had one yet, but, uh, it'd just be,

13  uh, as long as it -- or the property lines are correct,

14  you would probably be able to have it on the property

15  line.

16    Q    Okay.  So, uh, Mr. Swanson's fence should

17  be eligible under the new statute to be on the property

18  line; right?

19    A    (No response.)

20    Q    As long as it follows the surveyed property

21  line?

22    A    I don't know if -- if it would be allowed

23  to seeing that the -- the -- it was passed after the

24  fence was put into place.  I'm not sure it would be

25  allowed.

89

---

1    Q    So you're saying it wouldn't be

2  retroactive, the new ordinance?

3    A    I don't think so.  I'm not sure.

4    Q    Okay.  Where -- Where --  Do you have a

5  copy of the new ordinance?

6    A    No, I'm sorry; I -- I didn't bring one.

7  I've got one copy, and I put it in our ordinance book;

8  and I forgot to make a second one.

9    Q    Does, uh -- Is there some language in the

10  new ordinance that let's you agree to have, uh, -- to

11  allow a fence to be right on the property line?

12    A    It's not stated in the -- right in the

13  language.  It just says, uh -- Gosh, I'd have to read

14  it.

15         We could have it faxed over from the City

16  Hall real quick, if you like.

17    Q    It might be worth it.

18         MR. PRINGLE:  Want to take another little

19  break here?

20         MR. CORNETTA:  Yeah, might as well.

21         (Off the record at 11:20 a.m.)

22

23    (Atwood Exhibit 6 was marked for identification.)

24

25         (Back on the record.)

90

---

1  BY MR. PRINGLE:

2    Q    Okay.  Mr. Atwood, I'm handing you

3  Deposition Exhibit 6.

4         Do you recognize that?

5    A    Yes.

6    Q    And that's the new ordinance regarding side

7  fences--

8    A    Yes.

9    Q    --is that fair to say?

10         And this is the one that you were involved

11  in drafting through the Planning Commission?

12    A    Yes.

13    Q    All right.  Um, and we were having a

14  discussion before about the circumstances under which a

15  fence could be right on the property line.

16         Do you recall that discussion?

17    A    Yes.

18    Q    And where in this language is that

19  authorized?

20    A    It doesn't say it in the language itself.

21    Q    Okay.  And how do you feel like you have a

22  basis then for allowing one right on the property line?

23    A    I was told by the Council if I-- if I-- if

24  they met all of the requirements and the property lines

25  were correct that I could allow it to be on the property

91

---

1  line.

2    Q    Okay.  So you're saying that the

3  instructions you got from the City Council were

4  different than what the ordinance says that they passed?

5    A    I guess.  I mean, they still want it 3 feet

6  from the property line; but if someone wants it on the

7  property line, it will be allowed.

8    Q    Okay.  And it's your call and--

9    A    It's my call.  They made it my call.

10    Q    Okay.  And that's what the Council

11  instructed you?

12    A    Yes.

13    Q    So in your mind then since you now have

14  this discretion, what are the criteria for allowing a

15  fence directly on the property line?

16    A    I'd say if it didn't interfere with any

17  health safety issues; if it didn't interfere with

18  traffic; if the property lines were correct and both

19  neighbors were in agreement--

20    Q    Okay.

21    A    --I would, yeah, say sure.

22    Q    Okay.  So Karl's fence could qualify,

23  Mr. Swanson's fence could qualify under the new

24  ordinance on at least three out of those four criteria;

25  is that right?

92

1  A   I believe so, yes.

2  Q   And the -- And the one that there

3  obviously is a problem with is the Mayor would never

4  agree to it; right?

5  A   Probably.  Or yes.

6  Q   And that's because almost since day one,

7  he's had issues with Mr. Swanson and what he was doing

8  at his house?

9  A   Yes.

10 Q   Fair to say?

11 A   Yes.

12 Q   All right.

13     MR. PRINGLE:  I think I'm done, but just

14 let me consult with my cocounsel and my client.

15     (Off the record.)

16     (Back on the record.)

17     MR. PRINGLE:  All right.

18     Mr. Atwood, thank you very much.

19     MR. CORNETTA:  I'd like to ask him for--

20 put something on the record.

21     MR. PRINGLE:  Sure.

22     EXAMINATION

23 BY MR. CORNETTA:

24 Q   Mr. Atwood, you testified earlier

25 that -- about Deposition Exhibit Number 6 that your

93

---

1  recollection that you were given discretion by the City

2  Council to allow a fence to go on a side yard or lot

3  line -- side yard lot line if you thought it was

4  appropriate even though the ordinance is drafted in

5  Exhibit 6 says nothing about delegating any kind of

6  discretion to the zoning or the building inspector.

7  A   Yes.

8  Q   Do you care to modify your testimony?

9  A   Yes.  I might have -- I may have been

10 incorrect on, uh, -- on what I stated about having

11 authority to allow it to be on the property line.  I

12 might be recalling to being in our first draft notice

13 the authority; and that language might have been taken

14 out.

15     MR. PRINGLE:  Okay.  Well, I'm going to

16 follow up on that.

17     MR. CORNETTA:  Go ahead right ahead.

18

19     FURTHER EXAMINATION

20 BY MR. PRINGLE:

21 Q   So are you saying due to that modification

22 of the language that you don't have that authority?

23 A   I -- I'm not sure if I do or not.

24 Q   Okay.  But in your own mind, it's--

25 A   I thought I did.

94

---

1  Q   Okay.  Have you -- Have you exercised that

2  authority since the new ordinance came into effect?

3  A   I've had no fence issues since this case.

4  Q   Okay.

5      MR. PRINGLE:  All right.  Thanks.

6

7  (Proceeding concluded at approximately 11:30 a.m.)

8

9               --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

95

---

STATE OF WISCONSIN    )
                      )   SS      CERTIFICATE
COUNTY OF BARRON      )

    I, Nancy A. Williams, do hereby certify as the
duly-appointed court reporter and notary public, took in
shorthand and transcribed from my original stenograph
notes of the proceedings had in the above-entitled
matter on the 4th day of March, 2008, and that the
attached is a true and correct transcript of the
proceedings taken to the best of my knowledge.

    I further certify that I am neither attorney
nor counsel for, nor related to or employed by any of
the parties to the action in which this deposition is
taken; and furthermore, that I am not a relative of any
attorney or counsel employed by the parties hereto or
financially interested in the action.

    IN DEPONENT WHEREOF, I have hereunto set my hand
and affixed my Notarial Seal this 11th day of April,
2008.



NANCY A. WILLIAMS
Court Reporter/Notary Public
320 West LaSalle Ave., #4
Barron, Wisconsin 54812
(715) 537-5105

My commission expires October 12, 2008.

96