IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KARL SWANSON and
KATHY WIETHARN,

                Plaintiffs,

      v.

CITY OF CHETEK, a municipal corporation and
JERRY WHITWORTH, in his individual and
official capacities,

                Defendants.

OPINION AND ORDER

09-cv-97-slc

---

       This civil action for monetary and declaratory relief arises out of a property dispute that has become constitutional in scope. Plaintiffs Karl Swanson and Kathy Wietharn contend that defendants City of Chetek and Jerry Whitworth violated their rights under the Equal Protection Clause of the Fourteenth Amendment and that defendant Whitworth defamed and slandered them in violation of Wisconsin common law. Jurisdiction is present. 28 U.S.C. §§ 1331. Defendants have moved for summary judgment on plaintiffs' equal protection claim. Dkt. 18. For the reasons stated below, I am granting defendants' motion and I am declining to exercise jurisdiction over plaintiffs' remaining state law claims.

       The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Its purpose "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923). Equal protection claims typically involve a government regulation that draws a distinction using a suspect class,

such as race, alienage or national origin, or that denies a fundamental right.  *Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009).

The Supreme Court also has recognized what is referred to as a "class of one" equal protection claim.  *Engquist v. Oregon Dept. of Ag.*, ___ U.S. ___, 128 S. Ct. 2146, 2152-53 (2008). Plaintiffs have raised a class-of-one claim in this lawsuit.   Such a claim arises when a plaintiff has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.  *Olech*, 528 U.S. at 564.  As the court observed in *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995),

> If the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court.

> *Id.* at 179.

This concept is important, but its praxis requires plaintiffs to make an evidentiary showing that they have not made in this case.  Defendants raise a variety of grounds in support of their motion for summary judgment[1] but I need address only plaintiff's failure to present sufficient evidence to support an element of their claim: that the City treated them differently from a similarly situated individual.  Accordingly, defendants' motion will be granted.  Further, because plaintiffs' federal law claim fails, I am dismissing without prejudice their remaining state law causes of action pursuant to 28 U.S.C. § 1367.

Before setting forth the court's finding of facts, I note two procedural points that should not surprise anyone.  First, I did not accept at face value the parties' characterizations or

---

[1] Defendants assert that plaintiff Wietharn is not a proper party to the equal protection claim; that defendant Whitworth cannot be held personally liable for the defendant City's official actions; and that the city cannot be held liable under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) or *Pembauer v. City of Cincinnati*, 475 U.S. 469 (1986).  *See* dkt. 18.

2

summaries of facts.  Instead, where the parties disputed the accuracy of a proposed finding of fact, I looked at the record cited by the proposed fact and found as fact that which the evidence supported rather than a party's subjective characterizations or synopses.

Second, I disregarded proposed findings of fact that were not supported by the cited record.  The court's "Helpful Tips" document (which the parties received as an attachment to the preliminary pretrial conference order) warned that "[t]he court will not search the record for factual evidence . . . if you do not propose a finding of fact with the *proper* citation, the court will not consider that evidence when deciding the motion."  Dkt. 7 at 9 (emphasis added).  Proper citation means an accurate pinpoint cite.  Anything less would force the court to explore entire documents or depositions in search of admissible evidence supporting the proposed fact.  This court does not have the time or inclination to go fish.  Thus, I have disregarded proposed findings of fact that failed to provide proper citation to supporting factual evidence and to which the other side objected.  With these points in mind, I find the following facts from the parties' proposed findings of fact to be material and undisputed:

FACTS

**I.  Parties**

Plaintiffs Karl Swanson and Kathy Wietharn are adults who regularly reside together in Arvada, Colorado.  Defendant City of Chetek (the City) is a Wisconsin municipal corporation with its principal offices located in Chetek, Wisconsin (north of Eau Claire).  Its population in 2007 was about 2200.  Defendant Jerry Whitworth regularly resides at 418 Lakeview Drive in Chetek, Wisconsin.  At all times relevant to this lawsuit, Whitworth was the duly elected mayor for Chetek.

3

## II. Plaintiffs' Interactions with Defendants

### A. Swanson's Remodeling Project

On July 1, 2006, Swanson purchased a lakeside vacation home at 424 Lakeview Drive in Chetek, Wisconsin.  Wiethorn holds no ownership interest in Swanson's vacation home, but she uses it for vacation purposes.  Whitworth's home is adjacent to and west of Swanson's property.  Swanson and Whitworth met in June 2006, but had no other direct, in-person contacts with each other until June 2007.

In July 2006, Swanson hired Jim Milleon as a general contractor to remodel Swanson's vacation home.  Prior to beginning construction, Milleon had some material delivered to the vacation home.  After the materials were delivered, defendant Whitworth contacted Bill Koepp, the City's building inspector at the time.  Whitworth complained to Koepp that construction had begun without a building permit.  Koepp spoke with Milleon and issued him a building permit from the City for the remodeling project.  The permit states:

> Permit No. 1332
> Remodel - Repair
> Floor, Crawl - other

(Swanson Decl., dkt. 41, exh. A.)  Milleon began remodeling in August or September 2006 and finished in April 2007.

Whitworth became very upset with Koepp for issuing the building permit, proclaiming that the house was not in a condition to be improved upon and that it should be torn down. Several times during remodeling, Whitworth and Lorrain Helmer, Swanson's aunt,[2] entered

---

[2] Whitworth was with Helmer because the two were in a romantic relationship.  Apparently, in 2006 Helmer began staying at Swanson's vacation home and while there, met Whitworth.  Sometime later, they married each other.

4

Swanson's home and poked around without being invited.  On one visit, Whitworth told Milleon that the remodel looked nice and commented that the City should have charged more for the permit.  In December 2006, Milleon asked Swanson to call Whitworth because his contractor's insurance would not cover Whitworth and Helmer while he was working on the vacation home and Whitworth had told Milleon that the building permit was not valid. Swanson called Whitworth and told him not to enter the home again.  Nothing was said about the validity of the permit.

In the spring of 2007, Whitworth called Swanson to complain about dirt being dumped on his side of the yard.  Swanson told Whitworth that although there was nothing he could do at the moment, he would contact Whitworth later to solve the problem.

### B.  Swanson's Fences

On January 1, 2007, Joe Atwood replaced Koepp as the City's building inspector.  In May 2007, Swanson spoke with Atwood about Swanson's plan to erect a fence on the border between his and Whitworth's property.  Swanson planned to run a split rail fence from the front yard to the house and to run a chain link fence from the house down to the lakefront.  Atwood advised Swanson that he would need to obtain a permit to erect his fences and that the fence needed to be set back three feet from the property line.

On May 21, 2007, Wietharn went to Atwood's office to obtain the fence permit in Swanson's name.  While they were talking, Whitworth entered the room; he was angry and began shouting at Atwood.  Whitworth told Atwood not to give Wietharn a permit and asked Wietharn why she was building a fence.  She said that the fence would keep Whitworth's dogs out of Swanson's yard and that she had photos of his dogs in the yard.  Whitworth responded

5

that the dogs were not in Swanson's yard and he told Wietharn to "bring your photos on, Sweetie." Atwood did not provide Wietharn with a permit that day, but told her that he would be out to the house the next day.

The next day, Atwood went out to Swanson's vacation home to speak with Wietharn. Wietharn asked Atwood where the planned front fence could be located. Atwood then measured five feet from the edge of the road pavement and told her that the fence could be located there. Later that week, Wietharn returned to Atwood's office to speak about obtaining the necessary permit. Atwood was late for meeting because he had been meeting with the City Council and Mayor Whitworth. Atwood informed Wietharn that the city ordinance for structure permits applied to the fence Swanson wanted built. Wietharn contended that the structure ordinance should not apply because a fence was not a structure. Wietharn did not want to fill out the paperwork for a structure permit, so she did not file an application. Atwood did not issue a permit. Atwood told Wietharn to go ahead and have the fence built.

After Wietharn's meetings with Atwood, Swanson hired American Fence Company to erect his fences. The project was completed on May 31, 2007. The side fence was erected on Swanson's property, a few inches from the property line. The front fence was erected six inches inside the five-foot line Atwood had measured for Wietharn. While the fences were being erected, Whitworth came over and told Swanson's contractors that the fence was improperly located and would have to be moved. He also said, "I think [Swanson and Wietharn] are drug dealers - I have the police looking into it. I hope you got paid up front. I think they will stiff you." After the fences were erected, Atwood met with Wietharn, shook her hand and said the fences looked nice.

6

**C.  Enforcement of the City's Building Code Ordinances Against Swanson**

Shortly after the fences were erected, defendant Whitworth stood in his front yard and peered at Wietharn through the windows in Swanson's vacation home.  He also made faces and danced at her.  Wietharn decided to have trees planted in the yard to block Whitworth's ability to look into the house's windows.

On June 27, 2007, contractors arrived at Swanson's property to plant trees.  After their arrival, Whitworth jumped into his truck and drove away.  Soon after his departure, Atwood arrived at Swanson's property.  Whitworth returned to his home about the same time.  Atwood handed plaintiff Wietharn a stop-work order and told her that the trees could not be planted because there was a dispute over whether the fences were in the proper location.  He threatened that Wietharn and the contractors would be arrested if they proceeded to plant the trees.  While Atwood spoke with Wietharn, Whitworth stood in the street and repeatedly yelled to Atwood, asking if he should call the police.  Atwood told Wietharn she could tear up the stop order if the trees were planted about nine feet from the property line.  She agreed to have the trees planted further away from the fences and no citations were issued regarding the trees.

On June 28, 2007, Atwood issued Swanson a citation describing the violation as, "no permit and to[o] close to street and property line."  Wietharn Decl., dkt. 42, exh. 1.  This citation listed three City ordinance violations: (1) failure to obtain a permit; (2) boundary fence in violation of three foot set-back; and (3) fence in violation of five foot from street set-back.  Atwood handed a citation to Wietharn and mailed one to Swanson by certified mail.

The City's investigation and its decision to issue Swanson a citation was initiated by Whitworth.  He had many conversations with Atwood about Swanson's fences.  Whitworth

would ask how things were going with Swanson's fence permits, where the fences were going to be located and when and if Atwood was taking care of the situation. Whitworth was angry whenever he discussed Swanson's fence permits with Atwood. The City held a closed session discussion about the decision to cite and prosecute Swanson. Also, before issuing the citation, Atwood consulted the City's attorney, who advised him to issue the citation.

### D.  Municipal Court Proceedings Against Swanson

Although the City attempted to serve Swanson with the citations by certified mail, he never received the letter. On July 24, 2007, the City Municipal Court entered default judgment against Swanson. On August 4, 2007, Swanson retained counsel and by agreement between the parties the July 24 default judgment was set aside and new charges were served on Swanson. The new charges were issued as three citations: (1) N851854 - three foot boundary fence violation; (2) N851855 - five feet to street line fence violation; and (3) N851856 - failure to obtain a permit. Swanson contested all the citations and a municipal court trial was set for May 27, 2008.

On October 2, 2007, legal counsel for the City, Matthew Cornetta, filed a two-count civil complaint against Swanson alleging: (1) violation of ordinance 13-1-132(c)(2), the five-foot setback from street requirement, and (2) violation of ordinance 13-1-24(d)(3), the three-foot property line set back requirement. The complaint did not include the citation for failure to obtain a permit. At some point before trial, the three-foot property line violation was also dropped from the case.

8

On April 18, 2008, the City filed an amended complaint adding the new charge that Swanson had violated ordinance 13-1-132(c) by erecting his front fence within the City's right-of-way. The amended complaint kept the allegations of a violation of 13-1-132(c)(2), the five foot street set back requirement. On May 27, 2008, a trial to the court was held. During the case, the City acknowledged that there was no 13-1-132(c)(2) five -foot setback violation because Swanson's fence was three feet high and the ordinance only applied to fences at least four feet in height. At the close of the City's case, Swanson's legal counsel moved to dismiss all the remaining claims in the complaint, which the judge granted. The judge determined that Swanson had not failed to obtain a permit because the permit issued to Milleon for the remodeling covered the fence work and remained valid. The judge also determined that the charge regarding encroachment on the City's right-of-way could only be maintained in a civil action for trespass. The City did not appeal the judge's decision.


## III.  The City Enforcement of Building Code Ordinances on Other Citizens

### A.  Michele Eberle's Fence

Michele Eberle, Swanson's neighbor to the east, erected a fence between her property and Swanson's property. In May 2008, an unknown amount of time after the fence had been built, Wietharn informed Atwood that Eberle's fence crossed onto Swanson's property in some areas. Atwood had not personally issued a permit for the fence. Atwood looked into the location of Eberle's fence and found that the fence did cross onto Swanson's property by eight inches in some areas.

On May 24, 2008, Atwood filled out a building permit application form for Eberle. The permit allowed for the relocation and extension of Eberle's boundary fence. On June 5, 2008,

9

Eberele's significant-other, Tom Zweifelhofer, signed the application on her behalf.  Atwood issued the permit, which allowed, "Fence work.  Fence may be placed on property line.  3ft. from property line or apply for a variance."  Porter Decl., dkt. #31, exh. 5 at 61.

Although Atwood permitted Eberle's fence to be relocated to the property line, he was unaware whether Swanson consented to having the fence on the property line and never asked.  Atwood believed that he had discretion to authorize the relocation of Eberle's boundary fence to the property line.

## B.  Other Fences in Chetek

Atwood was not aware of any application for building permits for fences being denied between 2000 and 2009.  The only citations for building code violations that Atwood ever issued were the citations he issued to Swanson.  The only stop-work order Atwood ever issued was the one he issued to Swanson to stop Wietharn from planting trees.  Further, there are no records of any other citations or stop-work orders issued by the City from 2000 to 2009.  The permit issued by the City for building a fence was the same permit issued for building anything.  When Koepp was the City building inspector, permits for fences were approved that placed the fences on or within three feet of the boundary line because Koepp believed that such proximity was permitted by the City's ordinances.

## ANALYSIS

## I.  Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  In ruling on

10

a motion for summary judgment, the admissible evidence presented by the nonmoving party must be believed and all reasonable inferences must be drawn in the nonmovant's favor. However, a party that bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires a trial. *Hunter v. Amin*, 538 F.3d 486, 489 (7th Cir. 2009) (internal quotation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

The applicable substantive law will dictate which facts are material. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). Further, a factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). The court's function in a summary judgment motion is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

## II. Plaintiff's Equal Protection Claim

### A. Overview of the "Similarly Situated" Requirement

The facts found for the purpose of deciding summary judgment suggest that the Mayor of Chetek employed his city's bureaucracy to wage a personal vendetta against the out-of-staters who moved in next door and undertook unwelcome remodeling and fencing projects. Although the Equal Protection Clause provides a remedy when a powerful public official picks on a person out of sheer vindictiveness, a plaintiff can prevail only if he establishes that "the government is

11

treating unequally those individuals who are prima facie identical in all relevant respects, and that the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). As a result, "it is difficult to succeed with such a claim." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

To satisfy the "similarly situated" element, "comparators must be *prima facie* identical in all relevant respects, or directly comparable to plaintiff in all material respects." *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005); *Reget v. City of La Crosse*, ___ F.3d ___, No. 06-161, 2010 WL 424581, at *3, (7th Cir. Feb. 8, 2010). Although there is no precise formula used to determine whether an individual is similarly situated to another, "[i]t is clear that similarly situated individuals must be very similar indeed." *McDonald*, 371 F.3d at 1002; *Reget*, 2010 WL 424581, at *3. This high burden is necessary because meaningful application of the similarly-situated requirement is important to avoid distorting the scope of protection in class-of-one equal protection claims. *McDonald*, 371 F.3d at 1009.

A tight similarly-situated requirement avoids constitutionalizing all tort law or transforming every claim of improper provision of municipal services into a federal case. *McDonald*, 371 F.3d at 1009. Therefore, a class-of-one plaintiff must show the discriminatory nature of the government's action by establishing not only that he was wronged but also that he was treated differently from similarly situated people. *Id.* As a result, "a class of one claim must fail where the plaintiff has 'failed to identify someone who is similarly situated but intentionally treated differently than he.'" *Lunini v. Grayeb*, 395 F.3d 761, 770 (7th Cir. 2005) (quoting *McDonald*, 371 F.3d at 1002); *see also Levenstein v. Salafsky*, 414 F.3d 767, 776 (7th Cir.

12

2005) (Plaintiff must identify another similarly situated individual who was treated differently even when his alleged differential treatment was the result of "totally illegitimate animus."); *cf. Bell v. Duperrault*, 367 F.3d 703, 708 (7th Cir. 2004) (plaintiff "must eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification"). As the court noted in *Lunini v. Grayeb*,

> Of course the law must provide some remedy for extreme abuses of power by public officials. However, absent some comparative showing of discrimination among similarly situated individuals or classes of individuals, such a remedy cannot be obtained via the Equal Protection Clause.

> 395 F.3d at 769 n.5.

There is dicta in *Lauth v. McCollum*, 424 F.3d 631 (7th Cir. 2005) that might be viewed as suggesting circumstances in which it is unnecessary for a plaintiff to contrast himself to a similarly situated person. Although the court upheld summary judgment against the plaintiff police officer who was suing his chief, it noted that the paradigmatic class-of-one case:

> . . . is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen. Perhaps he is the holder of a license from the state to operate a bar or restaurant or other business, and the official deprives him of a valuable property right that identically situated citizens toward whom the official bears no ill will are permitted the unfettered enjoyment.

> 424 F.3d at 633.

The reference to "identically situated citizens," confirms that there is no escaping the similarly-situated requirement, and the court goes on to note that the plaintiff in *Lauth* had identified no other officer "who despite being similarly situated was deliberately treated differently, let alone one who was prima facie identical in all relevant respects." *Id.* at 634, citations omitted.

13

In sum, to establish a prima facie case in a class-of-one lawsuit, there is no substitute for the plaintiff establishing differential treatment compared to others similarly situated.

**B.  Similarly Situated to Plaintiffs**

"The first element a plaintiff must prove in establishing a class-of-one equal protection claim is the existence of similarly situated individuals." *Sellars v. City of Gary*, 453 F.3d 848, 850 (7th Cir. 2006).  Generally "whether individuals are similarly situated is a factual question for the jury." *Lunini*, 395 F.3d at 770 n.6.  However, "where it is clear that no reasonable jury could find that the similarly situated requirement has been met, a grant of summary judgment is appropriate." *Id.* (citing, *e.g.*, *McDonald*, 371 F.3d at 1002).

Plaintiffs have failed to provide evidence that raises a genuine issue of material fact about the similarly-situated requirement of their class-of-one claim. Plaintiffs attempt to raise a genuine issue regarding the similarly-situated requirement in two ways: (1) they point to a neighbor, Michelle Eberle, and her fence; and (2) they point to the fact that defendant Chetek issued many building permits for fences but, with the exception of the citations and stop-work order issued to plaintiffs, Chetek did not issue any citations or stop-work orders for building code violations from 2000 to 2009.  Let's explore each in turn:

**1.  Michelle Eberle**

Plaintiffs contend that Eberle is a similarly situated individual who was treated more favorably than Swanson after erecting a fence near a property line.  But even drawing all

reasonable factual inferences in plaintiffs' favor does not establish that Eberle's situation was "very similar" to Swanson's.

Plaintiffs have not provided many specific facts about Eberle or her fence. Instead, plaintiffs skip ahead to posit five ways in which defendants allegedly treated Eberle more favorably than Swanson. I surmise from this approach that plaintiffs are contending that Eberle is prima facie identical to Swanson because they both built boundary fences. It's not that simple. The mere fact that both Swanson and Eberle built boundary fences does not make them similarly situated for equal protection purposes. "Various factual traits, circumstantial nuances, and peculiarities can set [parties] apart, rendering them, by virtue of their differences, amenable to disparate treatment." *Racine Charter One, Inc.*, 424 F.3d at 681. The factual traits and circumstantial nuances of the two boundary fences establish that Eberle is not a suitable comparator to Swanson for class-of-one purposes.

Plaintiffs' first and second examples of preferential treatment involve obtaining a permit for erecting a boundary fence. Specifically, plaintiffs contend that despite Wietharn visiting Atwood's office twice, they were not provided with a fence permit application and were denied a permit to erect a boundary fence. In comparison, Eberle not only was granted a fence permit but Atwood filled out the permit for her. First, plaintiffs' characterization of what happened slightly overstates the resistence presented by the City because the City never actually denied them a permit. Atwood told Wietharn that in order to build the fence, she needed a structure permit; Wietharn responded that Atwood was wrong: no such permit was needed. Atwood was unmoved. Because Wietharn did not want to file the building permit application, she left without filing any application at all. Thus, although it is reasonable infer that the City imposed

15

a bureaucratic hurdle in order to slow down the process, the City did not actually "deny" plaintiffs a permit because plaintiffs never actually applied for one.

A more material difference is that plaintiffs were attempting to obtain a permit to erect a new fence while Eberle received a permit to move an already-erected fence that did not comply with the City's setback requirements. *Cf. Bell v. Duperrault*, 367 F.3d at 707 (plaintiff failed to show that two proposed comparators were similarly situated when plaintiff was applying to build a new structure while the other two were replacing and improving already-existing, dilapidated structures).

In a variation on this point, Eberle sought to move her already-erected but encroaching fence to a proper location in response to her neighbors' accurate observation that Eberle's fence crossed their property line. In contrast, while plaintiffs were discussing with Atwood how to erect their fence properly, their neighbor to the west was clamoring for no fence at all. Of course, plaintiffs' clamoring neighbor was Whitworth, the mayor and one of the defendants in this lawsuit. But this does not mean that Whitworth was disqualified from complaining about a proposed fence abutting his property that he believed–genuinely, it seems–would violate the City's building code. To the same effect, Whitworth's status as mayor did not require Atwood to ignore his opposition to plaintiff's fence. It would be fair to suppose that city employees everywhere in America give prompt, careful attention to any complaint made by their mayor, but this supposition is a non sequitur at this step in the analysis. The operative question right now is whether the lack of opposition to Eberle's permit request means that she is not similarly situated to plaintiffs, whose permit application was opposed by their neighbor. It does and she is not.

16

Third, plaintiffs point out that Atwood issued Swanson a citation for building a fence without a permit but did not issue Eberle the same citation.  However, the circumstances in which Swanson and Eberle built their fences without a permit are materially different.  When Atwood contacted Eberle about having built her fence without a permit, she agreed to purchase a permit to correct her mistake.  In contrast, plaintiffs did not agree to obtain the permit that Atwood said they needed; rather, Wietharn argued that Swanson did not need a building permit to erect a fence.  Further, whether Eberle received preferential treatment in not being cited for fence violations cannot be determined because, as discussed below, the dearth of facts about Eberle's fence makes it impossible to compare her circumstances to Swanson's.

Fourth, plaintiffs observe that Swanson was issued a citation for erecting his front fence in *alleged* violation of set-back ordinances, but Eberle was not issued a citation for erecting boundary fence that *indisputably* crossed onto Swanson's property.  It's an accurate observation, but it doesn't satisfy the tight, narrow similarly situated requirement.  Different circumstantial nuances and different municipal policies and rationales could augur different approaches to front fences set back from public streets as opposed to boundary fence encroachments onto private land.

For instance, with respect to the three-foot set-back citation issued against Swanson, Swanson's entire boundary fence was erected a few inches from the property line after plaintiffs were told that it should be erected three feet from the property line.  Eberle's fence crossed onto Swanson's property in some areas by eight inches and when she was told by Atwood that the fence had to be moved, she agreed.  There is no evidence regarding where the remainder of Eberle's fence was located.  All we know about Eberle's fence is that it was a boundary fence that

17

crossed onto Swanson's property is some areas.  Plaintiffs provide no evidence regarding the type of fence, such as, split rail or chain link and wood or metal, the height of the fence, the length of the fence, *etc*.  Such specific information is relevant to determining whether Swanson was similarly situated to Eberle.  *See Srail*, 588 F.3d at 946 ("[E]vidence of similarity requires *specificity*." (Emphasis added)).  For example, the City's ordinances treat fences of different heights differently.  *See* Porter Decl, dkt. 31, exh. 6, at 24 (Sec. 13-1-132(c)(2) does not apply to fences less than four feet in height).  Further, there is no evidence where–or even *if*–Eberle ever moved her fence.  The little bit we do know about Eberle's fence is not enough to establish that her situation is prima facie identical to Swanson in all relevant respects.  With so little evidence regarding Eberle's fence and the circumstances surrounding its erection, a jury could only speculate about whether Eberle is very similar to Swanson.

The fifth and final circumstance plaintiffs' cite is that Atwood issued plaintiff a stop-work order to stop planting trees near the boundary fence that Atwood believed to be located in violation of the three-foot set-back requirement but he did not issue Eberle any stop-work order regarding trees she planted.  But there are no proposed facts regarding the planting or location of trees on Eberle's property.  Plaintiffs merely mention the fact in their opposition brief, unaccompanied by a cite to any supporting evidence in record.  Plts' Opp. Br., dkt. 38, at 13.  As stated in the court's procedures to be followed on motions for summary judgment attached to the preliminary pretrial conference order, "The court will not consider facts contained only in a brief." Dkt. 7 at 12 (Sec. I.B.4.).  Accordingly, there are no facts from which a reasonable jury could find that Eberle was similarly situated to plaintiffs with respect to the stop-work order Wietharn was handed.

18

Plaintiffs have failed to make a prima facie showing that Eberle is identical to them in all relevant respects. There are too few similarities and too many differences for her to constitute an adequate comparator in plaintiff's class-of-one equal protection claim. Put another way, no reasonable jury could deduce from defendants' treatment of plaintiffs compared to defendants' treatment of Eberle that defendants had denied plaintiffs equal protection of the law.

**2. Lack of citation or stop-work order from 2000 - 2009**

This leaves plaintiffs' contention that they must have been treated differently from other similarly situated individuals because Swanson is the only person to receive building code citations and a stop-work order from the City in the years between 2000 and 2009. There is simply no evidence from which a reasonable jury could find that any of the people who erected fences between 2000 and 2009 within the jurisdiction of the City were similarly situated to plaintiffs. There are no proposed facts whatsoever about any of these other fences. These fences might be front fences or boundary fences, five foot fences or two foot fences; they may be located on the property line, three feet from the property or on someone else's property; their erection may have been done with a permit or without; and variances may or may not have been granted. In short, there is no way of comparing the circumstances surrounding the erection of plaintiffs' fences to the circumstances surrounding the erection of any other fences erected between 2000 and 2009.

Plaintiffs' argument is similar to that rejected in *Maulding Dev., LLC v. City of Springfield, Ill.*, 453 F.3d 967 (7th Cir. 2006). In that case, a development company run by a "Caucasian male," at the urging of "certain African-American City officials," sought approval from the City

of Springfield to build warehouses on the city's east side, "an area with a significant African-American population." Although the plan met all of the technical requirements for this type of project and no variances were necessary, the neighbors to the proposed development site on the east side subsequently objected to its plan; in fact, at a public hearing on the plan, the developer was verbally attacked with racial slurs. *Id.* at 968-69. When the matter came before the city council for a vote, the plan was denied 10-0, with one council member noting that "the City had never before denied approval for development plans that met all of the technical requirements." *Id.* The company filed a class-of-one equal protection claim against the city and the district court granted summary judgment for city because there was no evidence of similarly situated entities. *Id.*

This decision was affirmed on appeal. The court explained that the company's claim was "doomed because of the total lack of evidence of someone who [was] similarly situated but intentionally treated differently than it" *Id.* at 970. Nonetheless, the company argued that "it [was] one of a group of developers seeking approval of large scale development plans, they all submitted plans that met the City's technical requirements, and all were approved except Maulding's." *Id.* The court rejected this argument explaining that "Maulding introduces no evidence regarding any of the other developers, not a single one."[3] The court explained:

> Even assuming other [development] plans were submitted to the City, how can we (or a jury) compare them to Maulding's plan? There is no evidence whatsoever to make such a comparison. There is no evidence establishing whether these other plans involved warehouses, or any type of commercial property for that

---

[3] The Court of Appeals for the Seventh Circuit recently reaffirmed this view in *Srail*, 588 F.3d 940, explaining that "[such an] argument is not only overly broad, but also, it fails to appreciate that evidence of similarity requires specificity."*Id.* at 946.

> matter.  There is no evidence establishing whether these other plans involved commercial property that, if developed, would abut already existing residential areas.  There is no evidence establishing whether these other plans involved the development of a new commercial area, or were simply a redevelopment of a preexisting site.  Furthermore, there is no evidence regarding the timing of these alleged other plans, such as whether they were submitted to the same or different members of the City Council, or even whether they were submitted in the last five (or fifty) years.  Finally, there is no evidence establishing that the other plans did not seek variances, like Maulding's.

*Maulding.* 453 F.3d at 971.

So too in the instant case: plaintiffs argue that they were treated differently from any other people who erected fences in Chetek because the City acted in a way that it had never acted before.  Without evidence concerning those other people, this argument cannot establish that those people were similarly situated to plaintiffs.

Plaintiffs also contend that their class-of-one equal protection claim should survive summary judgment because their case shares similarities with *Esmail v. Macrane*, 53 F.3d 176, a class-of-one case by a liquor store owner who claimed that the mayor of Naperville was engaged in a personal vendetta against him.  Because in *Esmail* the case had been dismissed for failure to state a claim, the court of appeals had to "take the facts alleged in the complaint as true, though of course without warranting that they are true."  *Id.* at 177.  Here, the case is before the court on a motion for summary judgment; therefore, plaintiffs, as the responding party, are required "to come forward with the evidence that it has-it is the 'put up or shut up' moment in a lawsuit." *Eberts v. Goderstad*, 569 F.3d 757, 766 (7th Cir. 2009).

Furthermore, as plaintiffs themselves note, the complaint in *Esmail*, 53 F.3d at 178, included a list of specific examples of individuals similarly situated to the plaintiff.  *See* Plts' Opp. Br., dkt. 38, at 15 ("Esmail included a list of examples of liquor licenses granted to applicants

who were equally or less-deserving than Esmail.").  Plaintiffs in this case have not provided any such list.  Merely providing examples of government harassment is not sufficient in a class of one case; plaintiffs must show that government officials singled them out from among similarly situated individuals for disparate treatment.  *Reget v. City of La Crosse*, No. 05-C-238-C, 2006 WL 240289, at *5 (W.D. Wis. Jan. 31, 2006) *aff'd* 2010 WL 424581 (7th Cir. Feb. 8, 2010).  Although plaintiffs contend that Eberle is a specific example of a similarly situated individual, their evidence falls short of supporting that contention.  Thus, without evidence of even one similarly situated individual, plaintiffs' class-of-one equal protection claim cannot survive summary judgment.

### C.  Remaining State Law Claims

Plaintiffs also assert state common law claims for defamation and slander against defendant Whitworth.  The court's subject matter jurisdiction for those claims is supplemental.  28 U.S.C. § 1367(a).  "Ordinarily, when a district court dismisses the federal claim conferring original jurisdiction before trial, it relinquishes supplemental jurisdiction over any state-law claims under 28 U.S.C. § 1367(c)(3)."  *Doe-2 v. McLean County Unit Dist. No. 5 Bd. of Dir.*, ___ F.3d ___, No. 09-1936, 2010 WL 199625, at *5 (7th Cir. Jan. 22, 2010).  Now that plaintiffs' class of one claims have been dismissed, I decline to exercise supplemental jurisdiction over their state law claims.

22

ORDER

IT IS ORDERED that:

1.      Defendants City of Chetek's and Jerry Whitworth's motion for summary
        judgment on plaintiffs Karl Swanson's and Kathy Wietharn's equal protection
        claim is GRANTED;

2.      I decline to exercise supplemental jurisdiction over plaintiffs' state law claims
        for defamation and slander and those claims are DISMISSED without
        prejudice;

3.      The clerk of court is directed to entered judgment in favor of defendants on
        plaintiffs' equal protection claims and to dismiss plaintiffs' state law claims
        without prejudice.

Entered this 16th day of February, 2010.

                                BY THE COURT:

                                /s/

                                STEPHEN L. CROCKER
                                Magistrate Judge

23